RICE v JASKOLSKI

Docket No. 64660. Argued May 6, 1981 (Calendar No. 10).—Decided December 21, 1981.

Petrina Rice and Lawrence Rice brought a complaint for medical malpractice against Edmund J. Jaskolski, an oral surgeon, and Dr. Edmund Jaskolski and Associates, P.C., alleging negligence in performing oral surgery on Petrina Rice for the removal of four molars, resulting in a permanent injury to the mandibular nerve, and failure to warn that the surgical removal of the molars could result in facial paralysis. The defendant dentist was called for cross-examination under the statute by the plaintiffs and he testified as to his practice of advising patients of the possibility of numbness and his knowledge of the standard of care of oral surgeons in explaining the possibility to patients. The Wayne Circuit Court, Roman S. Gribbs, J., after the presentation of the plaintiffs' proofs, granted a directed verdict for the defendants because of failure to establish the prevailing professional standard of conduct for obtaining informed consent and for performing the surgery by independent expert testimony. The Court of Appeals, Bashara, P.J., and J. H. Gillis and Van Valkenberg, JJ., affirmed in an unpublished per curiam opinion (Docket No. 78-2527). The plaintiffs apply for leave to appeal.

In a unanimous per curiam opinion, the Supreme Court *held:*

Whether a surgeon should advise the patient of the possible result before an operation ordinarily requires expert testimony about the standard of care for the jury to evaluate. However, the defendant may provide the necessary expert testimony on cross-examination by the plaintiffs as an adverse witness under the statute. In this case Dr. Jaskolski testified that if the general standard of care for his specialty were different than his own, he would know it, and he explained what his standard of care was. He also affirmed his deposition on the standard of practice of oral surgeons as to warning of numbness. His testimony was sufficient to withstand in part the directed verdict he sought at the close of the plaintiffs' case.

The judgment of the Court of Appeals is reversed, and the case is remanded for trial on the claim of failure to warn.

*Joseph G. Aprea* for plaintiffs.

*Lee H. Wulfmeier* and *Stephen A. Schaefer* for defendants.

Amicus Curiae:

*Kerr, Russell & Weber* (by *A. Stewart Kerr, Curtis J. DeRoo,* and *Daniel G. Beyer)* for Michigan State Medical Society.

PER CURIAM. The trial judge granted a directed verdict in this malpractice action, because the plaintiffs had failed to establish the prevailing professional standard of conduct. We find the testimony of the defendant dentist[1] supplied evidence on this point sufficient to withstand a directed verdict as to one count of the plaintiffs' complaint, and we reverse.

I

Edmund J. Jaskolski, D.D.S., is a specialist in oral surgery. Petrina Rice first sought his services on April 28, 1972. Dr. Jaskolski found pericoronitis of her left mandibular third molar and a similar condition on the right which was not yet in active infection. For preventive reasons, he recommended surgical removal of four mandibular and maxillary molars.

Dr. Jaskolski removed the teeth on May 2, 1972. Mrs. Rice subsequently complained that the effect of the novocaine remained, and portions of her face remained numb. Mrs. Rice consulted a neurologist. He diagnosed a neuropathy involving the

---

[1] Dr. Jaskolski was called as a witness by the plaintiffs, during their case, for cross-examination under MCL 600.2161; MSA 27A.2161.

mentalis position of the mandibular nerve, and he concluded the nerve injury was permanent.

Mrs. Rice filed a complaint in Wayne Circuit Court which alleged Dr. Jaskolski's malpractice in carrying out the surgical procedure and in failing to warn Mrs. Rice "that such proffered surgery would or could possibly result in facial paralysis or paresthesia".[2] At trial, Mrs. Rice testified about the manner in which the local surgery was performed. She said also that Dr. Jaskolski gave her no warning of the possibility of numbness on April 28 when she consented to the oral surgery or on May 2 when the surgery occurred. Dr. Jaskolski explained the procedure he used on Mrs. Rice. As to the warning of possible numbness, he acknowledged that he did not explain that potential complication to her on April 28 when she gave her consent, but claimed that he did so advise on May 2 before he began the surgical procedure and his notes reflected that numbness had been explained.

Asked about whether the warning on May 2 was given before or after surgery, Dr. Jaskolski stated: "The doctor is obligated to explain these conditions before not after." Despite protestations that he did not know what other oral surgeons did in like circumstances, the record discloses the following colloquy with Mrs. Rice's counsel:

"*Q.* But under the conditions that obtain, to your patient then, Mrs. Rice, my client, wouldn't the general standard have been for the possible numbness result to be explained?

"*A.* I can't speak for other offices.

"*Q.* You would have no knowledge?

"*A.* No.

"*Q.* Would your teachings have taught you such during your residency?

---

[2] Count I, ¶ 5 of the plaintiffs' complaint.

"*A.* Teachings with regard to this is usually the practitioner's discretion. If he feels it's serious enough, he should explain it. My standard of care with these conditions, I always explain it.

"*Q.* Your standard of care would be different than that of a general dentist practitioner?

"*A.* Absolutely.

"*Q.* If the general standard of care was any different, would you have known of it?

"*A.* Would you repeat that please?

"*Q.* If the general standard of care for your specialty at that time was any different, would you have known of it?

"*A.* I'm sure it would be published in our literature.

"*Q.* You do read current literature, do you not?

"*A.* Yes.

"*Q.* So if there were any new developments in the standard of care relative to the warning of patients about numbness after a mandibular extraction, you would have been made aware of it?

"*A.* Yes.

"*Q.* If, in fact, your standard was any different than the general standard, you would have been aware of it?

"*A.* Sure."

In conclusion, counsel asked about Dr. Jaskolski's deposition testimony:

"*Q.* Doctor, on page 61, the question beginning at the bottom, I asked, 'Doctor, I ask you this question with reference to the warning you testified you gave the patient regarding the possibility of numbness, would, and I ask you this from a general standpoint not a personal one, I'm asking relative to that standard any dentist would employ in a surgical removal procedure.' There was an objection. 'You mean any dentist' by [defendants' counsel]. [Plaintiffs' counsel], continuing: 'We'll limit it to any oral surgeon.' 'You want to know my standard of practice', your response, 'Do you want to know my standard of practice? My standard of practice of conditions that are possibly caused or com-

plications or problems the then existing condition is explained, numbness is explained, statistics are given and whether or not the patients are hearing this and listening to this or not, I don't know. I do know that the existing condition is explained.' 'Would that be a standard of practice as you as a professional with your experience would aptly apply to oral surgery?' Answer: 'Yes.' There is an objection. The question was repeated. 'Is the answer, yes?' The answer, again by you, 'Yes.' Question: 'Would that standard of care differ, or would it apply to a D.D.S. engaged in the practice of general dentistry in a surgical removal?' Answer: 'I would say this would be the standard of practice. There are many levels of training.' Were those then your responses to those questions?

"*A.* Yes.

"*Q.* Were they then true?

"*A.* Yes."

The trial judge treated the issues raised by Dr. Jaskolski's motion for directed verdict separately. He found that no evidence had been presented on the standard of care for the surgical procedure so that the jury could measure the alleged deviation from the standard. As to the informed consent issue, he said:

"This record is silent as to anything other than the defendant's practice or his personal standard.

\* \* \*

"In my view the jury would have to speculate as to what the standard of care was for oral surgeons following the dictates of the Michigan Supreme Court and the Court of Appeals for the reason that they could not apply the standard jury instruction dealing with what a *reasonable person* would have *construed or understood* given the question of informed consent, because that charge would be inappropriate and there is no criteria against which the jury could evaluate the plaintiff's statement vis-à-vis the defendant's statement since there is no evidence on this record establishing the

standard of care for either the medical treatment given, nor is there a standard of care in the profession for the kind of information that must be exchanged before the plaintiff or any patient is said to have received or given informed consent."

He granted the directed verdict. The Court of Appeals affirmed. We granted leave to appeal and asked the parties to address whether the record contained sufficient evidence to warrant jury consideration and whether we should adopt the rule developed by the Maryland Court of Appeals in *Sard v Hardy,* 281 Md 432; 379 A2d 1014 (1977).[3] Because we find the first issue dispositive, we do not address the second.

## II

In *Roberts v Young,* 369 Mich 133, 140; 119 NW2d 627 (1963), we said that there are some types of conduct of a medical practitioner which do not require expert testimony for a layperson to evaluate, but that is ordinarily not the case:

"The question presented is in substance whether a physician and surgeon before operating should advise the patient of all *possible* results. Whether such should be done would seem to be a matter to be determined with reference to the general practice customarily followed by the medical profession in the locality. *Twombly v Leach,* 65 Mass 397 [1853]; *Rosenberg v Feigin,* 119 Cal App 2d 783; 260 P2d 143 [1953]. The case of *Bang v Charles T Miller Hospital,* 251 Minn 427; 88 NW2d 186 [1958], is not in point for the reason that there a result, serious in nature, was certain to happen, whereas in the case at bar there was a mere possibility. As before indicated, whether such possibility should have been discussed with the patient is a matter to be determined in accordance with the general practice

_____

[3] 409 Mich 897 (1980).

customarily observed by practitioners in good standing of defendant Young's school of treatment."

The Court of Appeals has held, however, that the defendant himself may provide the necessary expert testimony. It first addressed the point in *Giacobazzi v Fetzer,* 6 Mich App 308; 149 NW2d 222 (1967):

"The question presented is whether in a malpractice action expert testimony may be elicited from a defendant physician called for cross-examination under the Michigan adverse party statute."

The Court concluded that the plaintiff should have been allowed to "establish her case in chief through defendants' expert testimony". 6 Mich App 313. Both in *Mitz v Stern,* 27 Mich App 459; 183 NW2d 608 (1970), and in *McPhee v Bay City Samaritan Hospital,* 10 Mich App 567; 159 NW2d 880 (1968), the Court accepted a defendant's testimony to establish the standard of care.[4]

We agree that the defendant may supply the necessary expert testimony.[5] The question here therefore is whether Dr. Jaskolski's testimony provided the jury with evidence it would need to evaluate Mrs. Rice's claim. We conclude that it did. He testified that if the general standard of care for his specialty were different than his own, he would know it and he explained what his standard of care was. He affirmed deposition testimony on the standard of practice of oral surgeons

[4] In *McPhee, e.g.,* the Court said:

"Without belaboring the point, we hold that the appellee's own testimony was, for the purpose of this case, sufficient evidence tending to show the standard of care to be exercised and that the plaintiff could rely on this testimony in attempting to establish a prima facie case." 10 Mich App 570.

[5] See also *Siirila v Barrios,* 398 Mich 576; 248 NW2d 171 (1976).

as to warning of numbness. This testimony was sufficient to withstand in part the directed verdict he sought at the close of the plaintiffs' case.

We reverse the judgment of the Court of Appeals and remand the case for trial on the first count of the plaintiffs' complaint. Costs to the plaintiffs.

COLEMAN, C.J., and KAVANAGH, WILLIAMS, LEVIN, FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., concurred.