SULLIVAN v RUSSELL

Docket No. 67174. Argued June 7, 1983 (Calendar No. 2).—Decided September 19, 1983.

Lillian Sullivan brought an action against Thomas J. Russell, D.D.S., in the Muskegon Circuit Court, alleging malpractice in the treatment of two of her teeth. At the close of the plaintiff's proofs, the defendant moved for a directed verdict on the ground that the plaintiff had failed to establish a breach of the applicable standard of care or that a breach had been the proximate cause of her injury. The Muskegon Circuit Court, Ronald C. Pannucci, J., granted the motion, holding that expert testimony was necessary to establish how much grinding is excessive. The Court of Appeals, R. B. Burns, P.J., and Mac-Kenzie and Kallman, JJ., affirmed in an unpublished opinion per curiam (Docket No. 46533). The plaintiff appeals.

In a unanimous opinion by Justice Cavanagh, the Supreme Court *held:*

Expert testimony was not required in this dental malpractice case, where the unsolicited treatment of the plaintiff's teeth exhibited such a manifest lack of professional care that it would be within the common knowledge and experience of the ordinary layman that the conduct was careless and not in conformity with the standard of professional practice in the community.

1. Generally, expert testimony is required in a malpractice case to establish the applicable standard of care and to demonstrate that the professional practitioner breached that standard. However, such testimony is not required where the lack of professional care is so manifest that it would be within the common knowledge and experience of the ordinary layman that the conduct was careless and not in conformity with the standards of professional practice and care in the community.

2. In this case, because the defendant moved for a directed

REFERENCES FOR POINTS IN HEADNOTE

31 Am Jur 2d, Expert and Opinion Evidence § 19.

61 Am Jur 2d, Physicians, Surgeons, and Other Healers § 364.

Standard of care owed to patient by medical specialist as determined by local, "like community," state, national, or other standards. 18 ALR4th 603.

verdict, the evidence must be viewed in the light most favorable to the plaintiff. So viewed, the evidence showed that the defendant, asked to remove marks from two teeth, ground off portions of teeth for which treatment had not been requested, fracturing the enamel of those teeth and necessitating dental repair. It would be within the common knowledge and experience of the ordinary layman that the unsolicited treatment of the teeth which resulted in pain and a change in appearance and which required subsequent repair exhibited a manifest lack of professional care. The plaintiff should not have been required to present expert testimony regarding the breach of the standard of care to withstand the defendant's motion.

Reversed and remanded for a new trial.

PHYSICIANS AND SURGEONS — DENTISTS — MALPRACTICE — EVIDENCE.

Expert testimony is not required to establish a case of dental malpractice where the professional shortcoming is so manifest that it would be within the common knowledge and experience of the ordinary layman that the conduct was careless and not in conformity with the standard of professional practice in the community.

*Mark F. Sullivan* for the plaintiff.

*Cholette, Perkins & Buchanan* (by *Edward D. Wells)* for the defendant.

CAVANAGH, J. The trial court granted a directed verdict in favor of defendant, and the Court of Appeals affirmed.[1] We granted leave to appeal in order to determine whether plaintiff made out a prima facie case of dental malpractice necessary to withstand defendant's motion for a directed verdict.[2]

---

[1] Unpublished opinion per curiam of the Court of Appeals, decided on November 7, 1980 (Docket No. 46533).

[2] More specifically, the issue presented is whether plaintiff, in order to withstand defendant's motion for a directed verdict, was required to present expert testimony regarding the alleged breach of the applicable standard of care. Although not directly involved in this case, MCL 600.2912a; MSA 27A.2912(1) generally states the plaintiff's burden of proof in establishing the applicable standard of care in a malpractice action.

# I

On March 10, 1976, plaintiff filed a complaint against defendant, alleging dental malpractice in that he filed away too much of her teeth Nos. 10 and 11.[3] Trial was to a jury, and, at the close of plaintiff's proofs, defendant moved for a directed verdict, claiming that there had been no expert testimony concerning whether defendant had breached the applicable standard of care. The trial court granted defendant's motion, holding in pertinent part that

"based upon these facts taken more favorably to the plaintiff, * * * the excessive grinding is a matter which is subject to the necessity of an expert, or the necessity of expert testimony in a medical malpractice case.

---

[3] Each permanent tooth in an adult's mouth is identified by both descriptive terminology and a numerical designation. Since this case involves some of plaintiff's upper teeth, it is necessary to explain the pertinent terminology and designations. The numerical designations begin on the far upper right (No. 1) and continue in numerical order to the far upper left (No. 16). Numbers 1 and 16 denote what are known as the third molars, commonly called the wisdom teeth. Numbers 8 and 9, *i.e.,* the two upper middle front teeth, are known descriptively as the upper right central incisor and the upper left central incisor, respectively. The tooth immediately left of the latter is known as the upper left lateral incisor and is designated as No. 10. Continuing leftward, the next tooth is known as the upper left canine or cuspid and is designated as No. 11. The final tooth important for our purposes is designated as No. 12 and is known as the upper left first bicuspid or premolar. See, generally, 21 Encyclopaedia Britannica (1970), Teeth, pp 755-759.

A fair reading of plaintiff's complaint reveals allegations pertaining only to the excessive filing away of the upper left lateral incisor (No. 10) and the upper left cuspid (No. 11). However, the parties tried the case and have argued on appeal as if the allegations of malpractice also included the excessive filing away of the upper left first bicuspid (No. 12) and the fracturing of the upper left lateral incisor (No. 10). Accordingly, pursuant to GCR 1963, 118.3 and 865.1(1), (7), we order that plaintiff's complaint be amended to include the latter two theories regarding teeth Nos. 10 and 12 in the allegations of dental malpractice. See, *e.g., Davis v Koppers Co, Inc,* 335 Mich 9, 13-18; 55 NW2d 152 (1952); *Toledo Pipe Organ Co v Paradise Theatre Co,* 318 Mich 342, 347-348; 28 NW2d 224 (1947); *Smith v Baumgarten,* 313 Mich 683, 685; 21 NW2d 921 (1946).

\* \* \*

"This court finds that even taking all of the evidence most favorably to the plaintiff that there is no [expert] testimony on this record to indicate that this defendant has breached the standard of care in the community for the procedure as prescribed, and, therefore, for all of those reasons, the court grants the motion for directed verdict."

Plaintiff appealed by right, and the Court of Appeals affirmed, holding that

"[t]he trial court properly granted the defendant's motion for a directed verdict. In order to submit a case of alleged malpractice to the jury, the plaintiff must produce medical testimony to the effect that what the attending physician or dentist did was contrary to the practice in that or similar communities. The plaintiff failed to come under the exception to the general rule that the jury could reasonably conclude from its own knowledge and experience that the outcome must necessarily be the result of negligence and that no expert testimony was needed."[4]

---

[4] Like defense counsel, the Court of Appeals opinion exhibits a misunderstanding of exactly which teeth plaintiff claims were the subject of dental malpractice. Defendant's statement of the facts is totally confusing, while the Court of Appeals thought plaintiff's central complaint concerned her upper left central incisor (No. 9). For a proper characterization, see fn 3 and accompanying text *supra.* Also, the Court of Appeals appears to have conducted its review by construing the evidence presented at trial in the light most favorable to defendant. That ignored the trial judge's findings of fact which were not clearly erroneous, GCR 1963, 517.1 and 810, and was wholly improper, *i.e.,* the evidence presented at trial must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences therefrom in favor of that party must be drawn. *Dodd v Secretary of State,* 390 Mich 606, 611-612; 213 NW2d 109 (1973); *Schedlbauer v Chris-Craft Corp,* 381 Mich 217, 229-230; 160 NW2d 889 (1968); 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), pp 529-530. Finally, when conducting its review, the Court of Appeals gave great weight to deposition testimony from plaintiff's current dentist. Significantly, however, that deposition was never admitted into evidence at trial. Obviously, its consideration when determining the merits of the directed verdict motion was improper.

We granted plaintiff's delayed application for leave to appeal.[5]

## II

Since we must determine the propriety of the directed verdict in defendant's favor, it is necessary to set forth a detailed summary of the evidence presented at trial which related to the standard of care and its alleged breach.

Plaintiff testified that, prior to her visit to defendant on March 11, 1974, her upper left teeth looked just like their counterparts on the upper right, specifically, Nos. 10 through 12 were longer. She scheduled the March 11 appointment in order to have defendant remove two small marks from her two upper central incisors. However, according to plaintiff, more occurred:

"Well, so I was in a prone position on the chair. And, he proceeded to remove those two little worn marks on those two front teeth, which was fine. And then, he was looking out the window. He just kind of had a far-away look, you know. He said, 'These teeth look so much better rounded.' And, with that he filed off the side of my lateral tooth. And, I—I had this mirror because I keep it in my cosmetic purse, if I want to put lipstick on, or if I'm out. I looked down, and I said, 'What are you doing?' And, he—then he proceeded to start yelling at me. And, he went over to the—to this little box over by the door where he had instruments, and he changed something, made some kind of a change. And, he was yelling. I don't know exactly what he was yelling about. But, apparently, he was displeased. And, he came back, and he proceeded to round off this tooth that was down on a point. And, he tried to round it off to make it look right, I guess. And then, he went on to the other teeth so they would all kind of shape up.

"Well, I was stunned. I was—I was stunned. And, he

5 414 Mich 955 (1982).

got up, and I went to the door to the other office. As he got to the door, his two office nurses ran to him. Both came running. And, he went off. And, I laid there in the chair thinking he'd come back. I think a long time—a long time he did not come back. Perhaps I should have made a big fuss. I didn't know. I was just stunned.

\* \* \*

"[T]he lateral tooth [No. 10], it came down, and it had a slight point. And, it went up. And then, the other teeth [Nos. 11 and 12] were just shortened—shorter."

Subsequently, plaintiff felt miserable and thought she looked terrible. Her upper left lateral incisor (No. 10) began to hurt, especially when exposed to temperature extremes. Although she was reluctant to accompany her husband on his business trip to Florida the next day, she did so. However, while in Alabama, she paid a professional visit to Dr. William Crandall, a dentist, who placed a temporary resin crown on plaintiff's upper left lateral incisor (No. 10). He could not restore teeth Nos. 11 and 12.

Plaintiff's husband testified that he had been married to plaintiff since 1943. After her visit to defendant on March 11, 1974, his wife was distraught, and he noticed a change in one of her teeth. However, even after subsequent dental repair work, there was still a noticeable "line" on plaintiff's upper left lateral incisor (No. 10) which had not been there before plaintiff's visit to defendant on March 11, 1974. He never noticed plaintiff, either consciously or subconsciously, grinding her teeth.

Plaintiff offered the deposition testimony of Dr. William Crandall, a Birmingham, Alabama, dentist. He first saw plaintiff on March 14, 1974, when she came to his office complaining that too much of her upper left lateral incisor (No. 10) had been

ground down by her hometown dentist and asking that a crown be placed on that tooth. However, although he recommended that a permanent crown be installed, he could not do so because of her short stay in Alabama. Instead, he installed a temporary resin crown and advised her to have a permanent one placed upon her return home. Upon examining tooth No. 10, he saw that "the contact points, the corners of the tooth were fractured off", *i.e.,* the enamel around the dentin was fractured and the tooth shortened.[6] Although he could not say whether that condition was caused by dental grinding or natural wear, it would be very unusual for that one tooth to wear down as he found it, *i.e.,* the opposing lower tooth would exhibit similar wear, but it did not. Indeed, plaintiff's other teeth exhibited only normal wear. A dentist would not grind that much off unless treating a malocclusion, *i.e.,* an improper bite, and then would inform the patient of the need for a return visit. He also saw plaintiff on March 15, 1974, in order to check her bite and to polish the resin so that it would look as much as possible like her other teeth. Plaintiff did not complain to him about any other teeth.

Plaintiff also offered the deposition of Dr. David Jackson, a periodontist[7] who had examined her on December 20, 1976. Since Dr. Jackson had been hired and his deposition taken by defendant, the trial court admitted the testimony pursuant to the adverse party statute.[8] Dr. Jackson considered

---

[6] Enamel is the hardest body tissue. It covers the dentin on the crown of each tooth. Dentin is calcified tissue which composes the majority of each tooth. It is highly sensitive and extends almost the entire length of each tooth. Encyclopaedia Britannica, *supra.*

[7] According to Dr. Jackson, a periodontist is a dentist who specializes in treating diseases of the teeth and disorders of the bite and jaw.

[8] The statute provides as follows:

"In any suit or proceeding in any court in this state, either party, if

himself "beyond anybody else" when it came to familiarity with the standard of dental practice in Muskegon and similar communities. Plaintiff complained to him that defendant had ground off an excessive amount of her upper left lateral incisor (No. 10). His examination revealed that most of plaintiff's teeth exhibited excessive wear. Such wear is usually the result of bruxism, *i.e.,* the unconscious grinding or clenching of the teeth, usually done while sleeping. He attributed plaintiff's wear and fractured enamel to bruxism. Also, plaintiff stated to him that she bit her fingernails; that can result in wear on the teeth. Normal chewing results in a force on the teeth of between 2 and 12 pounds per square inch. On the other hand, bruxism can result in a force of over 300 pounds per square inch. The use of a fine sandpaper disk to adjust the bite or round off rough edges is an acceptable dental practice. His examination of plaintiff revealed no evidence that defendant had violated the standard of care or that defendant had "slipped" when using the sandpaper disk on plaintiff. However, he could not tell how much of tooth No. 10 defendant removed nor whether defendant was responsible for that tooth's fracture, although he did not believe that it was possible to fracture tooth enamel with a grinding instrument and thought that Dr. Crandall misspoke himself,

he shall call as a witness in his behalf, the opposite party, employee or agent of said opposite party, or any person who at the time of the happening of the transaction out of which such suit or proceeding grew, was an employee or agent of the opposite party, shall have the right to cross-examine such witness the same as if he were called by the opposite party; and the answers of such witness shall not interfere with the right of such party to introduce evidence upon any issue involved in such suit or proceeding, and the party so calling and examining such witness shall not be bound to accept such answers as true." MCL 600.2161; MSA 27A.2161.

Although admission of Dr. Jackson's deposition was proper, pursuant to GCR 1963, 302.4, we do not wish to imply that it was also properly admitted for the reason advanced by the trial court.

*i.e.,* Dr. Crandall did not really mean that plaintiff's tooth was fractured, but merely that it was ground or worn down. The following exchange also occurred upon examination by plaintiff's counsel:

"*Q.* Doctor, assuming that the patient, at the time she saw Dr. Russell, had a certain amount of bruxism, certain amount of wear by virtue of her clenching, whether it's at night when she didn't know it—

"*A.* Yes.

"*Q.* —or during the daytime, and assuming that Dr. Russell or any other doctor in this community set out to shape the teeth and, in the process, was concentrating in his mind on something else and did an excessive amount of grinding so as to fracture that tooth, hypothetically, if that happened, would that violate the standard of care in this community?

"*A.* Hypothetically, I guess so."

Similarly, bruxism or excessive dental grinding could expose the dentin in a tooth.

Plaintiff also called defendant to testify pursuant to the adverse party statute. MCL 600.2161; MSA 27A.2161. Defendant saw plaintiff in his office on March 11, 1974, and "smoothed off some rough edges" on her upper central and lateral incisors (Nos. 7 through 10). He also polished those four teeth. When plaintiff left his office none of those teeth was fractured, although he could not remember whether any dentin was exposed. However, when examining some trial exhibits, defendant found plaintiff's teeth to be worn, some to the dentin, and attributed it to bruxism. Similarly, any fracture occurred after she left his office on March 11, 1974. He also claimed that plaintiff was not concerned with dental hygiene and that she made no complaints of pain while at the office on March 11, 1974. Defendant also denied that he

touched plaintiff's teeth Nos. 11 and 12 on March 11, 1974.

## III

Generally, expert testimony is required in a malpractice case in order to establish the applicable standard of care and to demonstrate that the professional breached that standard. *Rice v Jaskolski,* 412 Mich 206, 211; 313 NW2d 893 (1981); *Lince v Monson,* 363 Mich 135, 140-141; 108 NW2d 845 (1961). However, an exception to the general rule exists when "the lack of professional care is so manifest that it would be within the common knowledge and experience of the ordinary layman that the conduct was careless and not conformable to the standards of professional practice and care employed in the community." *Lince, supra,* p 141. Also *Wilson v Stilwill,* 411 Mich 587, 611-612; 309 NW2d 898 (1981); *Orozco v Henry Ford Hospital,* 408 Mich 248, 253-254; 290 NW2d 363 (1980); *Higdon v Carlebach,* 348 Mich 363, 377-381; 83 NW2d 296 (1957) (opinion of CARR, J.).

The following statements and findings were made by the trial judge when ruling on defendant's motion for a directed verdict:

"The court in concluding the evidence most favorable to the plaintiff assumes that there is no bruxism, assumes that Dr. Russell ground off too much of the tooth involved, assumes as a result of that that Lillian [Sullivan] was in some way or another affected by this, and that she has suffered pain in the past, somewhat little in the future; there is no testimony as to what she might receive in the future, that she has suffered mental anguish, that she has made expenditures for psychiatric treatment, that she has—at least I believe Dr. Crandall is the only one—expended money for past dental care in the form of Dr. Crandall, that this is

some form of disfigurement, that being different than the—her other teeth.

"Those are the facts that I would conclude most favorable to the plaintiff on ruling on this motion."

To the above we add that the evidence, viewed in the light most favorable to plaintiff,[9] showed that: (1) defendant, asked to remove two small marks from plaintiff's upper central incisors (Nos. 8 and 9), ground off portions of other teeth (Nos. 10 through 12) for which treatment had not been requested, and (2) subsequently, plaintiff's upper left lateral incisor (No. 10) was noticeably shorter and pointed, had fractured enamel, and required dental repair work.

When the evidence in this case is properly viewed, we hold that it would be within the common knowledge and experience of the ordinary layperson that the unsolicited treatment of teeth Nos. 10 through 12, which resulted in pain and a change in appearance and which necessitated subsequent dental repair work, exhibited a manifest lack of professional care, *i.e.*, it was careless conduct which violated the applicable standard of care. Consequently, the trial court erred in requiring plaintiff to present expert testimony regarding the alleged breach of the applicable standard of care in order to withstand defendant's motion for a directed verdict. Similarly, the affirmance by the Court of Appeals was erroneous.

Reversed and remanded to the circuit court for a new trial. Plaintiff may tax costs.

WILLIAMS, C.J., and KAVANAGH, LEVIN, RYAN, BRICKLEY, and BOYLE, JJ., concurred with CAVANAGH, J.

---

[9] See fn 4.