# STATE OF MICHIGAN

# COURT OF APPEALS

DEPARTMENT OF LICENSING &
REGULATORY AFFAIRS,

UNPUBLISHED
February 13, 2018

Petitioner-Appellee,

v

No. 335582
LARA Bureau of Professional
Licensing
LC No. 15-041401

JULIAN MATTHEW GORDON, Ph.D.,

Respondent-Appellant.

Before: RONAYNE KRAUSE, P.J., and FORT HOOD and O'BRIEN, JJ.

PER CURIAM.

Respondent appeals as of right the final order issued by the Michigan Department of Licensing and Regulatory Affairs' Board of Psychology Disciplinary Subcommittee, which found that respondent, a psychologist, violated MCL 333.16221(b)(*i*) (incompetence) and suspended respondent's license. We affirm.

## I. FACTS

Respondent's psychologist license was revoked in 1999 following his conviction for criminal sexual conduct. His license was reinstated in 2012, but he was placed on probation for a year. During that time, his practice was required to be supervised. After respondent became employed at the Nardin Park Recovery Center, the clinical director, Willy Scott, Ph. D., supervised respondent's psychology practice for "purposes of the board's [re-licensing] requirements."

A complaint filed in June 2015 alleged that respondent previously treated AE, an adult male, for substance abuse at Nardin Park from 2009 through December 29, 2012; that in 2012, respondent invited AE to join him at an outing for the area humane society, the two had dinner and drinks, and AE spent the night at respondent's home; and that shortly after, respondent allowed AE to move in with him and respondent initiated physical contact with AE. The complaint further alleged that, on May 11, 2014, the police were called to respondent's home after AE stabbed respondent. AE claimed that the stabbing occurred following an altercation in which respondent attempted to touch AE's penis. The complaint asserted that AE was not charged with respect to the incident. The complaint asserted that respondent violated MCL 333.16221(a) (negligence), (b)(*i*) (incompetence), (b)(*vi*) (lack of good moral character), and (h)

-1-

(violating or aiding and abetting in a violation of Article 15 or a rule promulgated under Article 15), and Mich Admin Code, R 388.2515(b) (multiple relationship with a current or former patient) and (g) (psychologist soliciting or engaging in a sexual relationship with former patient within 2 years after termination of the treatment or professional relationship).

On August 3, 2015, an administrative hearing was held before an administrative law judge (ALJ). At the hearing, petitioner orally amended the complaint to remove the allegation that respondent violated R 338.2515(g) because, although petitioner had subpoenaed AE at two different addresses, petitioner was uncertain whether AE would be appearing and AE was necessary to substantiate that allegation. In its opening statement, petitioner claimed that "this case really [came] down to a limited issue that [respondent] allowed a . . . former patient[] to live with him in his home."

At the hearing, it was established that respondent obtained a personal protection order (PPO) against AE after AE stabbed respondent on May 11, 2014. The PPO indicated that respondent was residing or had resided in the same household as AE. The PPO also indicated that AE had been evicted from respondent's residence on June 30, 2013, and that AE had started threatening respondent around November 2013.[1] According to the PPO, respondent never contacted the police or talked to his Nardin Park supervisor regarding "any concerns or issues with AE" prior to the stabbing incident.

Detective Sergeant Brent Ross testified that, after the stabbing, respondent told him that he had met AE approximately a year before the assault and that AE had been his roommate for the previous eight months. An investigator testified that, during an interview with respondent, respondent had acknowledged that AE had lived with him at some point. According to the investigator, "[AE] would come and go and the door would be left unlocked for him to enter and exit."

Respondent testified that he began treating AE in approximately June 2011 and terminated treatment in December 2012. According to respondent, AE "showed up" at respondent's apartment in October 2012 but did not start living there until November 2012. Respondent testified that AE "forcibly stay[ed] there" from November 2012 until June 2013. Respondent testified that, when AE moved in with him, respondent was "extremely frightened" because AE had threatened to harm respondent and to make allegations against him. However, respondent did not call the police. According to respondent, he told Dr. Scott that AE had showed up and forced himself into respondent's home "[p]robably [in] November, December." Respondent also testified that he told Dr. Scott that AE was harassing him, but he could not remember if he mentioned that AE was staying in his home.

Respondent further testified that he did not call the police or place anything in AE's patient record about AE harassing him because the Nardin Park administration was "very bad with a lot of these kinds of situations." Respondent said that he feared reporting AE's actions to

---

[1] Although respondent signed the PPO, he testified that the PPO was wrong and that the threats had actually "started much earlier than that."

the Nardin Park administration because, even though he had done nothing wrong, "[he] certainly would have lost [his] job." However, respondent later contradicted this testimony. Respondent testified that he "had a long discussion with administrator Paul Scott and Dr. Scott about what was going on," and that he told Nardin Park administration, via a letter, that AE was using his address. However, respondent conceded that nothing in the letter, which was dated December 29, 2012, indicated that AE was threatening respondent, that AE had pushed his way into respondent's home, or that AE had been staying in respondent's house since November. In fact, the letter stated that respondent had "NO contact" with AE since his discharge from Nardin Park. When asked to clarify whether he told the Nardin Park administration about AE's threats, respondent testified that he "told Dr. Scott personally," and that he tried to tell Paul Scott about it but "[h]e [was] not easy to talk to, so [respondent] confided in Dr. Scott . . . who was fully understanding of how difficult it [was] to deal with [administrator] Paul Scott."

When questioned about whether a psychologist allowing a patient to live in his home was consistent with the standard of care for a psychologist, respondent testified:

> That would be in general, but I mean by today's standards of the ethics code that would be very, very much unusual. I mean, it's not—for me in my situation, my background, it's extremely inappropriate. That would not be something I would do. You just asked me and I would not.

Respondent testified that he tried to resolve the issue by living elsewhere, by trying to have AE involuntarily hospitalized, and, eventually, by talking to the property owner, Gillian Levy. Levy eventually filed a notice for eviction of AE in March 2013. According to Detective Ross, respondent told him during an interview following the May 2014 stabbing that respondent had recently allowed AE to move back in.

Following the hearing, the ALJ issued a Proposal for Decision recommending that the Board of Psychology Disciplinary Subcommittee dismiss the administrative complaint. The ALJ's proposed decision found that AE was "forcibly staying" with respondent, that respondent had informed his supervisor of this, and that there "were ongoing episodes" in which AE threatened respondent. Based on these findings, the ALJ concluded that petitioner had failed to establish by a preponderance of evidence any of the allegations in the complaint. However, the disciplinary subcommittee disagreed with the ALJ's findings and conclusion. Based on the hearing record, the subcommittee made the following findings of fact:

> The Disciplinary Subcommittee rejects the findings that patient AE forcibly began staying in Respondent's home in October 2012. During a police investigation regarding an altercation in May 2014 between Respondent and AE, Respondent referred to AE as having been his "roommate" for eight months. . . . Additionally, a detective testified that Respondent stated that he had allowed AE to move back in after AE was evicted . . . and that AE had been living with him because AE was homeless and Respondent was trying to help him. . . . Furthermore, Respondent signed a statement when filing a petition for a personal protection order against AE that stated the threats did not start until November 2013, over a year after AE allegedly forcibly began living with Respondent. . . .

-3-

The Disciplinary Subcommittee also rejects the finding that Respondent notified Respondent's employer or supervisor that AE was forcibly staying in Respondent's home. On December 29, 2012, Respondent provided a signed statement indicating that he had learned from his employer that AE used his home address and phone number at another treatment facility. Respondent did not disclose that AE had been living in his home for over a month. In fact, Respondent did just the opposite, stating:

> "Since his discharge from NPRC, I have had NO contact with Mr. [E]. In the future, I will be much more careful to inform NPRC administration about any time clients obtain or suggest using information inappropriately."

In his testimony, Respondent contradicted his own statements by stating that he had told his supervisor, Willy Scott, Ph. D., that AE was harassing him and showing up at his home. . . . Later in his testimony, Respondent stated that he "certainly would have lost [his] job" had he told his employer that AE was staying in his home. . . . Furthermore, Department Investigator Christine Murray testified that Respondent indicated to her during her investigation that he did not tell anyone at work about AE living in his home. . . .

The Disciplinary Subcommittee finds that Respondent voluntarily allowed AE to live in his home. Respondent's statement that AE's threatening behavior began over a year after AE began living with Respondent; Respondent's lack of communication to his employer or others regarding the alleged threats during that year; and Respondent's reference in regard to AE as his "roommate" to police support that Respondent voluntarily allowed AE to live with him in his home.

Based on its findings, the subcommittee made the following conclusions:

The Disciplinary Subcommittee rejects the conclusion that Petitioner has not proven, by a preponderance of evidence, that Respondent violated section 16221(b)(*i*) of the Public Health Code, 1978 PA 368, as amended, MCL 333.1011 et seq, as alleged in the Administrative Complaint executed February 19, 2015.

\* \* \*

The Disciplinary Subcommittee concludes that Respondent's conduct of allowing a patient to live with him constitutes incompetence in violation of section 16221(b)(*i*) of the Public Health Code, supra.

Ultimately, the disciplinary subcommittee issued consequences for respondent's violation, which included a suspension of respondent's license for six months, the requirement that he work under an approved licensed psychologist supervisor upon reinstatement, and that his license be limited for two years following reinstatement. Respondent now appeals.

II. ANALYSIS

-4-

## A. STANDARD OF REVIEW

"Rulings by disciplinary subcommittees are reviewed on appeal solely under Const. 1963, art 6, § 28." *Bureau of Prof Licensing v Butler*, ___ Mich App ___, ___; ___ NW2d ___ (2017) (Docket No. 334687) (slip op at 2). Const 1963, art 6 § 28, provides:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.

In *Huron Behavioral Health v Dep't of Community Health*, 293 Mich App 491, 497; 813 NW2d 763 (2011), this Court stated:

> When reviewing whether an agency's decision was supported by competent, material, and substantial evidence on the whole record, a court must review the entire record and not just the portions supporting an agency's findings. Substantial evidence is what a reasoning mind would accept as sufficient to support a conclusion. Substantial evidence is more than a mere scintilla but less than a preponderance of evidence. A reviewing court must not substitute its discretion for that of the administrative tribunal even if the court might have reached a different result. Deference must be given to an agency's findings of face, especially with respect to conflicts in the evidence and the credibility of witnesses. [Internal citations and quotation marks omitted.]

## B. COMPETENT, MATERIAL, AND SUBSTANTIAL EVIDENCE

On appeal, respondent argues that the disciplinary subcommittee's findings of fact were not supported by competent, material, and substantial evidence on the whole record. Respondent alleges that the disciplinary subcommittee "opted to cherry pick facts to support" its narrative, and that the record as a whole suggests a contrary finding. We disagree.

Respondent first argues that the disciplinary subcommittee ignored that AE's threatening behavior actually began *before* November 2013. In support of his argument, respondent points to his testimony and the testimony of his witness, Levy. While this testimony may have supported a conclusion contrary to that of the disciplinary subcommittee, a reviewing court "may not set aside findings merely because alternative findings also could have been supported by substantial evidence on the record." *Edw C Levy Co v Marine City Zoning Bd of Appeals*, 293 Mich App 333, 341; 810 NW2d 621 (2011). This appeared to be a credibility determination: other evidence contradicted respondent's and Levy's testimony and supported that AE's harassing behavior started in November 2013, not before. In particular, the PPO signed by respondent indicated that the threats started in November 2013. The disciplinary subcommittee also found it significant that respondent never reported the alleged threats to either the police or

to his supervisors. Giving deference to the agency's finding of fact based on a credibility determination, *Huron Behavioral Health*, 293 Mich App at 497, we conclude that the disciplinary subcommittee's finding was supported by competent, material, and substantial evidence on the whole record.

Respondent also argues that the record does not support the disciplinary subcommittee's finding that he failed to communicate to his supervisor that AE was threatening him. Respondent again points to his own testimony to rebut the subcommittee's finding. Respondent argues, essentially, that he explained that his fear of reprisal prevented him from reporting AE's threats, which sufficiently rebuts the subcommittee's finding. While respondent's explanation is plausible, again, we "may not set aside findings merely because alternative findings also could have been supported by substantial evidence on the record." *Edw C Levy Co*, 293 Mich App at 341. The disciplinary subcommittee concluded that respondent had a different reason for not reporting AE's alleged threats: respondent had voluntarily allowed AE to reside with him. The subcommittee found it significant that, while AE was living with respondent, he wrote a letter to the Nardin Park administration stating that he had "NO contact" with AE; that respondent gave conflicting statements and changing testimony about who in the administration he reported AE's behavior to; and that respondent referred to AE as his "roommate"[2] while police were investigating the May 2014 stabbing. Giving deference to the agency's finding of fact based on a credibility determinations and conflicting evidence, *Huron Behavioral Health*, 293 Mich App at 497, we conclude that the disciplinary subcommittee's finding was supported by competent, material, and substantial evidence on the whole record.

## C. STANDARD OF CARE

Respondent next argues that petitioner failed to carry its burden of proof that he was "incompetent" because petitioner never established a standard for "incompetence" to be measured from. Respondent alternatively argues that, even were this standard established, petitioner failed to recognize that respondent was employed as a counselor at Nardin Park, not a psychologist, and the standard of practice applicable to a counselor may be different than one applicable to a psychologist. We disagree with both arguments.

First addressing respondent's argument that his applicable standard of practice was that of a "counselor," we find that argument unpersuasive. Respondent, throughout his hearing testimony, established that he was practicing as a psychologist at Nardin Park. Specifically, respondent testified that (1) he signed his patient progress reports for AE with his psychology credentials, (2) the 2000 hours of supervision that he was undergoing at Nardin Park was for his practice as a psychologist "in order to fulfill [his] licensing requirements," and (3) Dr. Scott

---

[2] Respondent contests the subcommittee's reliance on this fact because, according to respondent, it "was made under duress and while under the influence of prescription pain medications while [respondent] was still recovering in the hospital" from the May 2014 stabbing. Respondent essentially is contesting the weight that the disciplinary subcommittee gave to this evidence. Therefore, we reject respondent's argument because we may not substitute the agency's judgment for our own. *Huron Behavioral Health*, 293 Mich App at 497.

supervised him "for purposes of the board's requirements" that his psychology practice be supervised. Therefore, even though respondent testified that he was employed as a counselor at Nardin Park, he clearly testified that he was practicing as a psychologist.

With regard to respondent's argument that petitioner failed to establish the standard of practice for a psychologist, MCL 333.16221 provides in relevant part:

> The disciplinary subcommittee shall proceed under section 16226 if it finds that 1 or more of the following grounds exist:
>
> * * *
>
> (b) Personal disqualifications, consisting of 1 or more of the following:
>
> (*i*) Incompetence.

" 'Incompetence' means a departure from, or failure to conform to, minimal standards of acceptable and prevailing practice for a health profession, whether or not actual injury to an individual occurs." MCL 333.16106.

We need not address this argument because it is waived. Waiver is the intentional relinquishment of a known right. *Sweebe v Sweebe*, 474 Mich 151, 156-157; 712 NW2d 708 (2006). "It is . . . well-settled that a waiver may be shown by express declarations or by declarations that manifest the parties' intent and purpose." *Id*.

At the hearing, respondent's argument was that he was not incompetent because AE was forcibly staying with him without his acquiescence. To that end, respondent repeatedly admitted throughout the hearing that, if he voluntarily allowed AE to reside with him, it would fall below an acceptable standard of practice. Respondent testified that allowing a patient to live with him would be "very, very much unusual"; that it would be "extremely inappropriate"; and that, if he told that information to the Nardin Park administration, he "certainly would have lost [his] job." Therefore, by respondent's testimony at trial, he expressly conceded that voluntarily allowing a patient to reside with a psychologist would fall below a minimal standard of acceptable practice for a psychologist.

But even if this issue was not waived, respondent's argument would still fail. In the context of medical malpractice, the Michigan Supreme Court has recognized that it is unnecessary "to establish the applicable standard of care and to demonstrate that the professional breached that standard" when "the lack of professional care is so manifest that it would be within the common knowledge and experience of the ordinary layman that the conduct was careless and not conformable to the standards of professional practice and care employed in the community." *Sullivan v Russell*, 417 Mich 398, 407; 338 NW2d 181 (1983) (citation and quotation marks omitted). This Court has applied this standard in the context of disciplinary subcommittees regulating professional licenses. See *Sillery v Bd of Med*, 145 Mich App 681, 689; 378 NW2d 570 (1985), citing *Sullivan*, 417 Mich at 407 ("Where a professional's work product lacks such basic integrity as truthfulness, we believe that it is within the province of the layperson to determine that the conduct constitutes a failure to exercise due care."). In this case, we conclude that respondent's voluntarily allowing a patient to live in his home is so lacking of professional

-7-

care "that it would be within the common knowledge and experience of the ordinary layman that the conduct," *Sullivan*, 417 Mich at 407, failed to meet "minimal standards of acceptable and prevailing practice for a" psychologist, MCL 333.16106.

## D. PROCEDURAL DUE PROCESS

Lastly, respondent argues that he was denied a fair hearing because he was denied his constitutional right to confront AE due to AE's absence at the hearing. We disagree. This Court reviews a claim of constitutional error de novo. *People v McPherson*, 263 Mich App 124, 131; 687 NW2d 370 (2004).

The Confrontation Clause of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right. . . to be confronted with the witnesses against him. . . ." US Const, Am VI. Michigan has also adopted this right. Const 1963, art 1, § 20. Although this is an administrative agency case, the agency must still provide adequate procedural due process to the involved parties. *City of Livonia v Dep't of Social Services*, 423 Mich 466, 505; 378 NW2d 402 (1985).

In this case, the initial complaint asserted that respondent had an improper sexual relationship with AE. When it became apparent that AE was not going to appear at the administrative hearing, petitioner amended the complaint to remove this allegation because AE's testimony was necessary to prove it. Afterwards, petitioner limited its evidence to the issue of whether respondent improperly allowed AE to live in his home. AE's testimony on this subject was neither necessary nor required because respondent conceded that AE had lived with him at his residence. After the hearing, the disciplinary subcommittee did not base any of its findings on any statements made by AE; instead it relied entirely on statements made by respondent. These statements came from respondent's testimony at the hearing, testimony from other persons as to statements respondent made to them, and statements made by respondent in documents submitted at the hearing. Respondent has failed to show that he was unable to present any relevant evidence or that he was unable to adequately explore any issues due to the absence of AE. Accordingly, respondent has not established a violation of due process owing to the inability to confront AE at the hearing.[3]

---

[3] Respondent's argument appears to be premised on the notion that he had a right to confront AE because AE was an "adverse witness." However, because AE never appeared at the hearing, AE was not a "witness," let alone an "adverse witness." And as stated, the disciplinary subcommittee relied entirely on respondent's own statements in concluding that he voluntarily allowed AE to live with him. Respondent has provided no authority for the proposition that he had a right to confront AE based solely on the fact that AE was the complainant. See *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999) ("And, where a party fails to cite any supporting legal authority for its position, the issue is deemed abandoned.").

Affirmed.

/s/ Amy Ronayne Krause
/s/ Karen M. Fort Hood
/s/ Colleen A. O'Brien
