# STATE OF MICHIGAN

# COURT OF APPEALS

VICTOR KHZOUZ and AMAL KHZOUZ,

        Plaintiffs-Appellees,

v

STEPHEN MENDELSON, MD, and
MENDELSON ORTHOPEDICS, PC,

        Defendants-Appellants.

UNPUBLISHED
March 13, 2018

No. 333901
Wayne Circuit Court
LC No. 14-009384-NH

Before: M. J. KELLY, P.J., and JANSEN and METER, JJ.

PER CURIAM.

In this medical malpractice case, defendants, Stephen Mendelson, M.D., and his practice, Mendelson Orthopedics, P.C., appeal by leave granted[1] the trial court's order granting partial summary disposition in favor of plaintiffs, and denying defendants' motion in limine to preclude certain expert testimony as scientifically unreliable. We reverse and remand for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

This case arises out of post-surgical treatment that plaintiff[2] received from defendant Dr. Mendelson, a board-certified orthopedic surgeon, following arthroscopic knee surgery in August 2012. During the procedure, Dr. Mendelson inserted a "pain pump" in plaintiff's knee. The parties dispute whether the pain pump was placed subcutaneously (i.e., under the skin) or intraarticularly (i.e., within the joint). Anesthesia (called bupivacaine) from the pump apparently managed plaintiff's pain effectively following the surgery until the pump was removed. At that point, however, plaintiff's pain increased dramatically. A subsequent MRI revealed that plaintiff had lost a significant amount of cartilage in his knee, and plaintiff eventually sought treatment from a different physician.

---

[1] *Victor Khzouz v Stephen Mendelson MD*, unpublished order of the Court of Appeals, entered November 29, 2016 (Docket No. 333901).

[2] References to plaintiff in the singular denote plaintiff Victor Khzouz.

Plaintiff sued defendants for medical malpractice. He alleged that bupivacaine from the pain pump had caused a condition called chondrolysis, causing the cartilage in plaintiff's knee to rapidly deteriorate. Plaintiff further alleged that Dr. Mendelson's use of the pain pump fell below the applicable standard of care.

During discovery, the parties deposed five experts. Defendants' experts included Dr. Mendelson, Dr. John Denzin, and Dr. Roland Brandt. Plaintiff's included Dr. Harish Hosalkar and Dr. George Pappas.

Following discovery, the parties filed motions that essentially attacked the other side's experts. Defendants filed a motion in limine seeking to preclude "unreliable" testimony of plaintiff's experts, while plaintiff filed a motion for partial summary disposition, arguing that there was no genuine issue of material fact whether Dr. Mendelson breached the applicable standard of care by inserting the pain pump. In support of their respective motions, the parties presented several pieces of medical literature for the trial court's consideration. The literature in question concerns pain pumps used following arthroscopic shoulder surgery or intraarticularly, and it does not squarely address subcutaneous placement of a bupivacaine pain pump following arthroscopic knee surgery.

Ultimately, the trial court ruled in plaintiffs' favor with regard to both their motion for partial summary disposition and defendants' motion in limine challenging the reliability (and thus the admissibility) of the testimony of Dr. Pappas and Dr. Hosalkar. Plaintiffs sought and were granted interlocutory review in this Court.

## II. STANDARDS OF REVIEW

This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Heaton v Benton Constr Co*, 286 Mich App 528, 531; 780 NW2d 618 (2009). The trial court granted plaintiffs partial summary disposition under MCR 2.116(C)(10).

> A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013) (quotations marks and citations omitted).]

"Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient." *McNeill-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016). "This Court is liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008).

On the other hand, this Court reviews for an abuse of discretion the circuit court's *Daubert*[3] determination (i.e., its decision whether to exclude expert evidence for lack of scientific reliability). *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes," and "[t]he admission or exclusion of evidence because of an erroneous interpretation of law is necessarily an abuse of discretion." *Id*. "We review de novo questions of law underlying evidentiary rulings, including the interpretation of statutes and court rules." *Id*.

### III. ANALYSIS

Defendants argue that the trial court erred in several distinct and yet closely interrelated ways. They further argue that the trial court's errors warrant reversal. We agree.

"In a medical malpractice case, the plaintiff bears the burden of proving (1) the applicable standard of care, (2) a breach of that standard by the defendant, (3) an injury, and (4) proximate causation between the alleged breach of duty and the injury." *Rock v Crocker*, 499 Mich 247, 255; 884 NW2d 227 (2016). At issue here are the first two elements, and as a general rule, "[e]xpert testimony is required in medical malpractice cases to establish the applicable standard of care and to demonstrate that the defendant somehow breached that standard." *Birmingham v Vance*, 204 Mich App 418, 421; 516 NW2d 95 (1994).[4] A defendant physician may be qualified to offer expert testimony, including expert testimony regarding the applicable standard of care. *Rice v Jaskolski*, 412 Mich 206, 212; 313 NW2d 893 (1981).

For these purposes, "a 'specialty' is a particular branch of medicine or surgery in which one can potentially become board certified," and "a 'specialist' is somebody who can potentially become board certified." *Woodard v Custer*, 476 Mich 545, 561; 719 NW2d 842 (2006). Given that Dr. Mendelson was board-certified in orthopedic surgery at the time he utilized the pain pump at issue in this case, the parties agree that he qualifies as an orthopedic specialist. Consequently, he is held to a different standard of care than a general practitioner. See MCL 600.2912a(1); *Cox v Bd of Hosp Managers for City of Flint*, 467 Mich 1, 17 n 17; 651 NW2d 356 (2002). The applicable standard is enumerated by MCL 600.2912a(1), which provides, in pertinent part:

> [I]n an action alleging malpractice, the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:
>
> * * *
>
> (b) The defendant, if a specialist, failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the

---

[3] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

[4] Such expert testimony is unnecessary "when the lack of professional care is so manifest that it would be within the common knowledge and experience of the ordinary layman. . . ." *Sullivan v Russell*, 417 Mich 398, 407; 338 NW2d 181 (1983) (quotation marks and citation omitted).

facilities available in the community or other facilities reasonably available under the circumstances. . . .

Although this standard for specialists is sometimes referred to as a "national" standard of care, see, e.g., *Jalaba v Borovoy*, 206 Mich App 17, 22; 520 NW2d 349 (1994), that is a misnomer, *Cox*, 467 Mich at 17 n 17. As explained in *Cox*:

> The term "national," . . . is not an accurate description of the statutory standard of care for specialists. The plain language of subsection (b) states that the standard of care is that "within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances." Under the plain language of the statute, then, the standard of care for both general practitioners and specialists refers to the community. [*Id.* (citation omitted).]

Turning to the facts of this case, we agree with defendants that the trial court's analysis was erroneous in several fundamental ways. First, the trial court erred by failing to consider and decide whether the challenged testimony of plaintiffs' experts was substantively admissible *before* considering it for purposes of summary disposition under MCR 2.116(C)(10). See MCR 2.116(G)(6); *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999) ("[t]he reviewing court should evaluate a motion for summary disposition under MCR 2.116(C)(10) by considering the *substantively admissible* evidence actually proffered") (emphasis added). In other words, the trial court was incorrect when it reasoned that its summary disposition ruling rendered defendants' *Daubert* motion "moot". On the contrary, the substantive admissibility of such testimony was a key part of the summary disposition analysis—one the trial court neglected. Further, "a question is not moot if it will continue to affect a [party] in some collateral way," *In re Dodge Estate*, 162 Mich App 573, 584; 413 NW2d 449 (1987), and defendants' *Daubert* challenge had implications extending beyond summary disposition; as a motion in limine, it was aimed at precluding admission of the challenged expert testimony at *trial*.

Second, the trial court applied an incorrect legal standard to determine the applicable standard of care, erroneously relying on the pertinent model jury instruction, M Civ JI 30.01,[5]

---

[5] M Civ JI 30.01 provides:

> When I use the words "professional negligence" or "malpractice" with respect to the defendant's conduct, I mean the failure to do something which a [ *name profession* ] of ordinary learning, judgment or skill in [ this community or a similar one / [ *name particular specialty* ] ] would do, or the doing of something which a [ *name profession / name particular specialty* ] of ordinary learning, judgment or skill would not do, under the same or similar circumstances you find to exist in this case.

> It is for you to decide, based upon the evidence, what the ordinary [ *name profession / name particular specialty* ] of ordinary learning, judgment or skill would do or would not do under the same or similar circumstances.

rather than the language of the statute that sets forth the applicable standard of care for specialists, MCL 600.2912a(1). Although model jury instructions "are *intended* to accurately state applicable law," they do not constitute legal authority. *Moore v City of Detroit*, 252 Mich App 384, 387; 652 NW2d 688 (2002) (emphasis added). Conversely, it is well-settled that MCL 600.2912a(1) *does* authoritatively "set[] forth the standards of care for general practitioners and specialists." *Cox*, 467 Mich at 16. Therefore, when considering the applicable standard of care for purposes of summary disposition, the trial court should have relied on the actual language of MCL 600.2912a(1), not the model jury instruction's attempt to paraphrase that statute for lay jurors.

Third, the trial court erred by determining that it could not consider medical literature as *Daubert* evidence. "Under MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible." *Edry v Adelman*, 486 Mich 634, 642; 786 NW2d 567 (2010). "[T]he whole point of *Daubert* is that experts can't speculate. They need analytically sound bases for their opinions, and it is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." *Id*. at 642 n 6 (quotation marks, citations, and brackets omitted). "[W]hile not dispositive, a lack of supporting literature is an important factor in determining the admissibility of expert witness testimony." *Id*. at 640. Likewise, as our Supreme Court has explained several times, pursuant to MCL 600.2955(1) a court *must* consider the peer-reviewed medical literature cited by the parties when entertaining a *Daubert* challenge. *Elher*, 499 Mich at 28. Scholarly publications, peer-reviewed studies, and FDA publications are all "examples of objective and verifiable evidence[.]" *Krohn v Home-Owners Ins Co*, 490 Mich 145, 178; 802 NW2d 281 (2011). By holding otherwise, the trial court erred. And because its error in that regard formed part of the foundation for its ruling concerning the reliability of the challenged testimony (i.e., its admissibility under MRE 702 and MCL 600.2955(1)), the resulting ruling was "necessarily an abuse of discretion." See *Elher*, 499 Mich at 21.

Nevertheless, the trial court's several errors do not necessarily warrant reversal of its ruling regarding summary disposition. "This Court will not reverse a trial court's order of summary disposition when the right result was reached for the wrong reason." *Forest Hills Coop v City of Ann Arbor*, 305 Mich App 572, 615; 854 NW2d 172 (2014). Accordingly, plenary de novo review is required to determine whether the trial court ultimately reached the correct result.

A. SUBSTANTIVE ADMISSIBILITY OF THE CHALLENGED EXPERT TESTIMONY

As explained in *Rock*, 499 Mich at 260, "[a] physician who testifies regarding the standard of care at issue must satisfy the requirements of MCL 600.2169(1)." Pursuant to MCL 600.2169(2), when

> determining the qualifications of an expert witness in an action alleging medical malpractice, the court shall, at a minimum, evaluate all of the following:
>
> (a) The educational and professional training of the expert witness.
>
> (b) The area of specialization of the expert witness.

(c) The length of time the expert witness has been engaged in the active clinical practice or instruction of the health profession or the specialty.

(d) The relevancy of the expert witness's testimony.

In the instant case, we agree with defendants that the trial court erred by considering Dr. Pappas's standard-of-care testimony for purposes of summary disposition. Under MCL 600.2169(1)(a), an expert witness may only offer testimony regarding the applicable standard of care for a specialist if the proposed expert was board-certified in the same specialty "at the time of the occurrence that is the basis for the claim or action." *Rock*, 499 Mich at 262. Aside from Dr. Pappas's deposition transcript, plaintiffs cite no evidence regarding his qualifications as an expert. Although Dr. Pappas discussed orthopedic surgery at length during his deposition, he was neither asked nor did he testify whether he was board-certified in orthopedics or any other specialty, let alone whether he was board-certified at the time the surgery in this case was performed. Accordingly, plaintiffs failed to establish that Dr. Pappas's testimony concerning the applicable standard of care in this matter was substantively admissible, and it thus cannot be considered for purposes of this analysis.

However we disagree with defendants' contention that the trial court erred by considering Dr. Hosalkar's standard-of-care testimony for purposes of MCR 2.116(C)(10). To begin with, plaintiffs produced substantively admissible evidence establishing that Dr. Hosalkar was qualified under MCL 600.2169(1). Specifically, they produced his deposition testimony that he was board-certified in orthopedic surgery on the date in question and had devoted a majority of his professional time to the clinical practice of orthopedic surgery in the year preceding plaintiff's surgery, practicing "mainly" orthopedics during that timeframe.

Furthermore, on this record we cannot conclude that Dr. Hosalkar's testimony was substantively inadmissible under *Daubert*. In concert, MRE 702 and MCL 600.2955(1) "govern the inquiry into whether expert evidence is scientifically reliable." *Chapin v A & L Parts, Inc*, 274 Mich App 122, 127; 732 NW2d 578 (2007). MRE 702 provides:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

On the other hand, MCL 600.2955(1) provides, in pertinent part:

In an action . . . for injury to a person . . . , a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

-6-

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

"[A]ll the factors in MCL 600.2955 may not be relevant in every case." *Elher*, 499 Mich at 27. Additionally, "the trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Chapin*, 274 Mich App at 127. Rather, an expert opinion may be reliable even if it "is not shared by all others in the field or . . . there exists some conflicting evidence supporting and opposing the opinion[.]" *Id*. Put differently, "as long as the opinion is rationally derived from a sound foundation," it is admissible. *Id*. "Gaps or weaknesses in the witness' expertise are a fit subject for cross-examination, and go to the weight of his testimony, not its admissibility." *Wischmeyer v Schanz*, 449 Mich 469, 480; 536 NW2d 760 (1995).

At root, defendants' argument is that because there is no medical literature directly supporting Dr. Hosalkar's opinion, it is unreliable and thus inadmissible. The parties spend a great deal of their respective briefs debating the substance of the medical literature, with both sides inexorably concluding that such literature supports their position. This ignores the fact that every expert deposed in this case opined that there was no authoritative medical literature that is directly on point. Moreover, defendants ignore the fact that while a lack of supporting literature "is an important factor," it is not dispositive. See *Elher*, 499 Mich at 23. In this case, given the experts' consensus that no authoritative literature exists in support of either side's position, plaintiffs cannot be faulted for failing to produce such literature.

Also, we disagree with defendants' assertion that the cited medical literature does not offer any support for Dr. Hosalkar's standard-of-care testimony. Collectively, such literature establishes that, beginning in at least 2009, there was a growing concern within the orthopedic community that the intraarticular use of bupivacaine pain pumps was unsafe. Although such literature may not *directly* support every aspect of Dr. Hosalkar's standard-of-care testimony, it

lends credence to his opinion that, at the time in question here, the use of a bupivacaine pain pump following arthroscopic knee surgery—whether intraarticularly or subcutaneously—fell below the recognized standard of practice or care for board-certified orthopedic surgeons. At a minimum, the literature shows that Dr. Hosalkar's opinion was rooted in hard science, not merely speculation about effects that bupivacaine *might* have.

In sum, we discern no reason that Dr. Hosalkar's standard-of-care testimony would be inadmissible at trial. Hence, it is substantively admissible, and it may be considered for purposes of our ensuing summary disposition analysis.

### B.  SUMMARY DISPOSITION UNDER MCR 2.116(C)(10)

Considering all of the substantively admissible record evidence in the light most favorable to defendants, as the nonmoving parties, we conclude that partial summary disposition in plaintiffs' favor is unwarranted. Several genuine issues of material fact remain with regard to the applicable standard of care and whether Dr. Mendelson breached it.

Indeed, in their brief on appeal, plaintiffs inadvertently acknowledge one such genuine issue of material fact, asserting that "there is a question of fact as to whether the pain pump at issue was placed intra-articularly or subcutaneously." Plaintiffs are correct. Although Dr. Mendelson testified unequivocally that the pain pump was placed subcutaneously, and that he had "*never* inserted a pain pump intraarticularly," there is circumstantial evidence suggesting that his testimony in that regard might be either mistaken or intentionally false. (Emphasis added.) From such evidence, and in light of the evidence that it was widely known that intraarticular placement of a pain pump was associated with chondrolysis, a rational juror could infer that Dr. Mendelson's testimony regarding the placement of the pain pump was either mistaken or intentionally false. Hence, a genuine issue of material fact remains whether the pump was placed intraarticularly or subcutaneously.

Additionally, as several of the expert witnesses noted, even assuming that the pain pump *was* placed subcutaneously, there is a dearth of evidence about where, exactly, it was placed under plaintiff's skin. Accordingly, there is no evidence of how proximate the pain pump was to the site of plaintiff's arthroscopy. Consequently, there are at least two issues of fact with regard to where the pain pump was placed, and those factual disputes are decidedly material. Without a factual determination of what Dr. Mendelson actually did, and how he did it, it cannot be determined whether his conduct violated the applicable standard of care.

Finally, and contrary to the trial court's conclusion, there is a genuine dispute regarding the applicable standard of care. Dr. Mendelson opined that based on the existing literature when plaintiff's surgery was performed in 2012, it would not have been a violation of the standard of care for an orthopedic surgeon to place a bupivacaine pain pump intraarticularly following knee arthroscopy. Likewise, Dr. Denzin expressed the opinion that whether the intraarticular use of a Bupivacaine pain pump constituted a deviation from the standard of care at that time depended on the unique circumstances of the given case, noting that doing so might have been appropriate "if there was some reason to think that [plaintiff's] pain problem would have been excessive[.]" Dr. Denzin further testified that although subcutaneous placement of a pain pump following arthroscopic surgery is unnecessary "most of the time," every patient is unique. From such

testimony, a reasonable juror could conclude that either intraarticular or subcutaneous placement of a bupivacaine pain pump accorded with the applicable standard of care under the circumstances of this case.

We recognize that both Dr. Mendelson and Dr. Denzin made other statements that are arguably inconsistent with their standard-of-care testimony, and Dr. Hosalkar vigorously disagreed with their opinions. But "doubts pertaining to credibility, or an opposing party's disagreement with an expert's opinion or interpretation of facts, present issues regarding the weight to be given the testimony, and not its admissibility." *Surman v Surman*, 277 Mich App 287, 309; 745 NW2d 802 (2007). "The extent of a witness's expertise is usually for the jury to decide." *Id*. Accordingly, for these purposes, it is improper to gauge the credibility of the expert witnesses. See *Bank of America, NA v Fidelity Nat'l Title Ins Co*, 316 Mich App 480, 512; 892 NW2d 467 (2016) ("A trial court may not weigh evidence when ruling on a summary disposition motion, or make credibility determinations.") (citations omitted). Given the conflicting testimony from qualified experts in this case, it must be left for the trier of fact to decide which expert or experts to believe.

We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Kathleen Jansen
/s/ Patrick M. Meter