*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* VERNON EUGENE PROCTOR, M.D.

UNPUBLISHED
March 14, 2019

BUREAU OF HEALTH CARE SERVICES,

Petitioner-Appellee,

v

No. 342029
LARA Bureau of Professional
Licensing
LC No. 15-041398

VERNON EUGENE PROCTOR, M.D.,

Respondent-Appellant.

BUREAU OF HEALTH CARE SERVICES,

Petitioner-Appellee,

v

No. 342676
Board of Medicine
LC No. 15-041397

VERNON EUGENE PROCTOR, M.D.,

Respondent-Appellant.

Before: METER, P.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

In these consolidated appeals, respondent, Vernon Eugene Proctor, M.D., appeals as of right disciplinary actions taken by two professional boards respecting his medical practice. In Docket No. 342029, respondent appeals the January 2, 2018 determination of the Bureau of Professional Licensing, Board of Pharmacy Disciplinary Subcommittee's (the Board of Pharmacy) $5,000 fine and suspension of his controlled substance license for a minimum of six months and one day, with no automatic reinstatement. In Docket No. 342676, respondent appeals the Bureau of Professional Licensing, Board of Medicine Disciplinary Subcommittee's

(the Board of Medicine) November 30, 2017 decision to impose a $10,000 fine, place respondent on probation for one year, and limit his license to exclude him from (1) obtaining or prescribing Schedule II or III controlled substances for one year, and (2) providing Michigan Medical Marihuana certifications for two years. We affirm both the Board of Pharmacy's order and the Board of Medicine's order.

## I. FACTS

Respondent holds a Michigan medical license, a Michigan controlled substance license, and a federal controlled substance license. He became board-certified in addiction medicine in 2014. He has a registration under the federal drug addiction treatment act, 21 USC 823(g)(2), which allowed him to treat patients for opioid addiction using Schedule III drugs including Suboxone.[1] He operated an internal and holistic medicine practice in Baldwin, Michigan, saw patients at several locations in Michigan, and signed medical marijuana certifications at several clinics throughout the state.

Petitioner filed administrative complaints with the Board of Pharmacy and the Board of Medicine. Petitioner asserted that respondent prescribed and dispensed Suboxone without a proper federal Drug Enforcement Agency (DEA) registration and proper recordkeeping, prescribed controlled substances to patients without documenting therapeutic reasons, failed to document the destruction of morphine sulfate pills, and signed medical marijuana certifications without seeing patients.

The Administrative Law Judge (ALJ), heard the testimonies of respondent, petitioner's investigator, Janice Waldmiller, petitioner's expert witness, Dr. Phillip Rodgers, respondent's expert, Dr. Bruce Springer, other doctors, law enforcement agents, and other witnesses during eight days of hearings between October 2015 and August 2016. The ALJ considered respondent's treatment of 17 patients. The ALJ ultimately proposed that the Board of Medicine find that respondent breached the standard of care concerning patients CK, DL, PM, TT, and SW, and that he failed in his duties to keep records for JA, RA, KK, PM, TT and SS. The ALJ recommended that neither the Board of Medicine nor Board of Pharmacy find that respondent (1) improperly dispensed Suboxone, (2) issued prescriptions in Michigan without a DEA license registered in Michigan, (3) issued a medical marijuana certification without examination, (4) improperly disposed of morphine sulfate, or (5) unlawfully provided patient MS with methadone.

The Board of Medicine accepted the ALJ's findings regarding respondent's violation of law respecting treatment of specific patients, but in part rejected the ALJ's legal conclusions that respondent did not violate the Public Health Code (PHC) in relation to his certification of medical marijuana patients. The Board of Medicine concluded that respondent improperly prescribed methadone to MS and prescribed drugs in Michigan without a DEA license registered in Michigan.

---

[1] Suboxone is a combination drug that is used to treat opiate dependence.

The Board of Pharmacy also rejected in part the ALJ's legal conclusions. The Board of Pharmacy concluded that respondent violated the PHC by prescribing drugs in Michigan without a DEA license registered in Michigan, improperly dispensing Suboxone to patients, improperly destroying morphine sulfate without completing the required documenting of that action, and improperly prescribed methadone to MS without an Opioid Treatment Program or Narcotic Treatment Program waiver as required by law.

## II. GENERAL LEGAL STANDARDS

Our review of an agency's decision is limited to determining whether the agency's action was authorized by law, and whether the agency's findings of fact were "supported by competent, material, and substantial evidence on the whole record." Const 1963, art 6, § 28. "When reviewing whether an agency's decision was supported by competent, material, and substantial evidence on the whole record, a court must review the entire record and not just the portions supporting the agency's findings." *Dep't of Community Health v Risch*, 274 Mich App 365, 372; 733 NW2d 403 (2007). Evidence is substantial if a reasonable mind would accept it as "sufficient to support a conclusion." *Id*. Substantial evidence requires "more than a scintilla of evidence," but "may be substantially less than a preponderance." *Id*. (citation omitted.)

We review de novo questions of law surrounding an agency's decision. *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 101; 754 NW2d 259 (2008). We also review de novo issues of statutory interpretation. *Id*. at 102.

We review for an abuse of discretion preserved challenges to evidentiary rulings. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). A court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

When interpreting a statute, this Court's goal is to give effect to the intent of the Legislature. *US Fidelity & Guaranty Co v Mich Catastrophic Claims Ass'n (On Rehearing)*, 484 Mich 1, 13; 795 NW2d 101 (2009). The language of the statute itself provides the most reliable evidence of the Legislature's intent. *Id*. We read statutory phrases "in the context of the entire legislative scheme." *Mich Props, LLC v Meridian Twp*, 491 Mich 518, 528; 817 NW2d 548 (2012). We avoid interpretations that render statutory language meaningless. *Johnson v Recca*, 492 Mich 169, 177; 821 NW2d 520 (2012). "[A]gency interpretations are entitled to respectful consideration, but they are not binding on courts and cannot conflict with the plain meaning of the statute." *In re Rovas*, 482 Mich at 117-118.

## III. COMMON ISSUES

## A. EXPERT QUALIFICATION

Respondent argues that both Boards erred by relying on Dr. Phillip Rodgers's opinion testimony on the ground that he lacked the qualifications to testify as an expert about addiction medicine or medical marijuana certifications.[2] We disagree.

An expert witness may offer an opinion only if he or she has specialized knowledge that will assist the trier of fact to understand the evidence. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). The admissibility of expert witness testimony is governed by MRE 702, which states:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The record reflects that Dr. Rodgers was board-certified in family medicine, hospice, and palliative care, and licensed to practice medicine in Michigan. He was not board-certified in addiction medicine. He practiced family medicine and consulted in palliative care. He testified that his family medicine practice included treating patients with controlled substances. He estimated that a greater-than-average number of his patients had lives complicated by addiction, comprising "roughly 15 to 20 percent of [his] patients." He admitted that he refers patients with addiction problems to other doctors. The record reflects, however, that Dr. Rodgers gave presentations and taught continuing education courses on pain management that included controlled-substance prescribing, methadone prescribing, and treatment of chronic, non-terminal pain. He authored an article published in a national journal regarding the use of opioids for management of chronic pain. Dr. Rodgers's testimony established that he had familiarity with Suboxone treatment programs but did not prescribe the drug himself because his office lacked the necessary infrastructure. He testified that he had familiarity with the applicable standard of care for signing medical marijuana certifications as a physician. He explained that medical marijuana certification and prescribing controlled substances had the same standard of care requirements.

The record also indicates that Dr. Rodgers limited the scope of his expert opinions by declining to render an opinion about respondent's treatment of addiction or his practice respecting treatment with Suboxone. However, he opined regarding the standard of care for prescribing controlled substances to patients and that a physician breaches the standard of care by dispensing a controlled substance like Suboxone without the requisite license. Dr. Rodgers

---

[2] The ALJ qualified Dr. Rodgers as an expert in medicine and chronic pain management.

also testified regarding the general standard of care required of a physician respecting documentation of examination and treatment of patients.

The record reflects that Dr. Rodgers also had extensive knowledge, skill, experience, training, and education in prescribing controlled substances and treating patients who presented with addictions. We conclude that the ALJ did not err by qualifying Dr. Rodgers as an expert in medicine and chronic pain management because Dr. Rodgers had the requisite knowledge, skill, experience, training, and education to render expert opinions to assist the ALJ and the two Boards' decision-making.

Respondent also argues that Dr. Rodgers lacked the qualification to testify regarding the standard of care for signing a medical marijuana certification because he claimed familiarity with the standard of care but offered no testimony regarding how, when, and from what source he acquired his knowledge. Respondent contends that Dr. Rodgers's testimony that the same standard of care applied to signing medical marijuana certifications and prescribing patients controlled substances lacked reliability because the standards applicable for prescribing controlled substances were not derived from settled science, and medical marijuana certification differed from prescribing controlled substances. We disagree.

The lack of settled science on controlled-substance prescribing did not preclude Dr. Rodgers from opining about the applicable standard of care. MRE 702 obligates trial courts, as the gatekeepers, to ensure the reliability of expert testimony admitted at trial. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780; 685 NW2d 391 (2004). However, the subject of the scientific testimony need not be known to a certainty. *Nelson v American Sterilizer Co (After Remand)*, 223 Mich App 485, 491-492; 566 NW2d 671 (1997). "As long as the basic methodology and principles employed by an expert to reach a conclusion are sound and create a trustworthy foundation for the conclusion reached, the expert testimony is admissible no matter how novel." *Id*. at 492.

Dr. Rodgers acknowledged that there is no settled science on controlled-substance prescribing, but he testified that there are emerging standards of care. He explained that the standard of care for prescribing controlled substances includes:

> an evaluation of the patient for their presented symptoms and problems, a complete history, a physical examination as directed by their symptoms and history, a comprehensive treatment for controlled substances that not only includes controlled substances, but other effective modalities for the problems, whether it's pain or anxiety. It—it also includes regular follow-up to access for the safety and effectiveness of the treatment.

* * *

> One, should, if at all possible, obtain prior medical records prior to providing ongoing controlled substances.

* * *

In my opinion, signing medical marijuana certification providing ongoing therapy with controlled substance is no, not the standard of care to file a certification without getting all of the medical background.

Dr. Rodgers testified further that the standard of care for prescribing any controlled substance required understanding the patient's complete history and discerning whether the patient had a history of addiction. Dr. Rodgers stated that, in his experience, patients were not always able or willing to present their complete history, making obtaining and reviewing medical records essential before beginning therapy involving controlled substances. He testified that this experience informed his opinion that, before signing a medical marijuana certification, a physician must obtain the patient's medical records.[3] Accordingly, sufficient established methodology and principles served as the basis for Dr. Rodgers's opinions regarding the requisite standard of care.

Dr. Rodgers's lack of personal experience in certifying patients for medical marijuana use did not render his opinion inadmissible. An expert's specific qualifications are relevant to the weight of the expert's testimony, not its admissibility. *Gilbert*, 470 Mich at 788-789. Testimony may be inadmissible "[w]here the subject of the testimony is far beyond the scope of an individual's expertise . . . ." *Id*. at 789. In this case, Dr. Rodgers had expertise in chronic pain management and he had substantial experience and expertise in prescribing controlled substances. Medical marijuana is a Schedule II controlled substance. MCL 333.7214(e). Dr. Rodgers's testimony regarding the standard of care for prescribing controlled substances encompassed the standard of care for signing medical marijuana certifications. His testimony in this regard did not stray beyond the scope of his expertise and the ALJ did not abuse his discretion by admitting it. Therefore, because Dr. Rodgers qualified as an expert because of his knowledge, skill, experience, training, and education, and his expert testimony did not go beyond his expertise, to the extent that the two Boards considered his opinions in making their respective determinations, neither the Medical Board nor the Pharmacy Board erred.

We decline to determine whether courts should adopt medical malpractice standards regarding board-certified specialist opinions because our ruling would have no effect on the outcome of this case. The ALJ did not qualify Dr. Rodgers as an expert in addiction medicine, Dr. Rodgers offered no opinions in that regard, and his opinion testimony focused on the applicable standards of care and practice related to prescribing controlled substances to patients. Because petitioner did not offer and Dr. Rodgers did not opine about the practice of addiction medicine, we need not decide whether he would have qualified to do so.

Further, to the extent that respondent argues that the ALJ erred by failing to sequester Dr. Rodgers, we conclude that respondent waived this claim of error. A trial court has discretion when deciding whether to sequester witnesses and its decision will not be disturbed on appeal absent an abuse of discretion. *In re Jackson*, 199 Mich App 22, 29; 501 NW2d 182 (1993). A

---

[3] The ALJ qualified Dr. Springer as an expert witness in the field of medicine and the treatment of addiction. The record reflects that Dr. Springer, like Dr. Rodgers, testified that maintaining medical records is part of the standard of care for controlled-substance prescribing.

waiver is "the voluntary relinquishment or abandonment—express or implied—of a legal right or advantage." *Reed Estate v Reed*, 293 Mich App 168, 176; 810 NW2d 284 (2011). Although respondent initially requested Dr. Rodgers's sequestration, the record reflects that, when petitioner challenged the request and explained that it properly provided notice to respondent regarding his testimony as an expert, and that Dr. Rodgers would testify based on the records he reviewed and the testimony he heard during the proceedings, respondent's counsel acknowledged having been provided notice. The record reflects that he effectively abandoned the sequestration request respecting Dr. Rodgers, waiving this claim of error. Therefore, the ALJ did not err by not sequestering Dr. Rodgers.

## B. DEA REGISTERED ADDRESS

Respondent argues that competent, material, and substantial evidence did not support the Boards' findings that respondent prescribed controlled substances in Michigan while his DEA registered address was in New York because the Michigan Automated Prescription System (MAPS) reports were unreliable and federal regulations exclude a person from having to register an office in another state if the person only prescribes medication. We disagree.

Respondent first asserts that the MAPS reports lacked reliability and consistency. We defer to an agency's findings of fact, "particularly with regard to witness credibility and evidentiary questions." *VanZandt v State Employees' Retirement Sys*, 266 Mich App 579, 588; 701 NW2d 214 (2005). The determination of the weight of the evidence is an issue for the trier of fact. *Drew v Cass County*, 299 Mich App 495, 501-502; 830 NW2d 832 (2013).

In this case, the record establishes that, at times during 2011 and 2012, respondent had DEA registered addresses only in New York. The MAPS reports showed that respondent prescribed controlled substances to patients in Michigan during this period. Dr. Springer testified that MAPS reports should be carefully considered because they sometimes include significant mistakes. The record reflects that one of respondent's MAPS reports included prescriptions by another person as well as by respondent. The Medical Board and the Pharmacy Board considered the MAPS reports and each Board found that the reports showed that respondent prescribed medication while his DEA registered address only featured a New York location. We decline to overturn the Boards' decisions that the MAPS reports were entitled to evidentiary weight despite some mistakes because not all of the reports contained mistakes.

Respondent also argues that petitioner's complaint lacked legal sufficiency because it did not reflect a change in the law that excluded a person from having to register an office in another state if a person only prescribed medication. We reject this argument.

Under 21 CFR 1301.12(a), "[a] separate registration shall be required for each principal place of business or professional practice at one general physical location where controlled substances are manufactured, distributed, or dispenses controlled substances or list chemicals." Subpart (b), subparts (1)-(4) identified the locations deemed not to be places where controlled substances are manufactured, distributed, or dispensed.

Respondent asserts that, under the December 2006[4] version of 21 CFR 1301.12(b)(3)'s exception, he did not need to have a Michigan registration. 21 CFR 1301.12(b)(3)'s exception in the December 2006 version provided:

> An office used by a practitioner (*who is registered at another location in the same State or jurisdiction of the United States*) where controlled substances are prescribed but neither administered nor otherwise dispensed as a regular part of the professional practice of the practitioner at such office, and where no supplies of controlled substances are maintained. [Emphasis added.]

Notably, in the summary of the final rule, the Deputy Assistant Administrator of the Office of Diversion Control provided clarification and explained the government's interpretation and intent respecting the 2006 version of the exception in relevant part as follows:

> The CSA requires that a separate registration be obtained for each principal place of business or professional practice where controlled substances are manufactured, distributed, or dispensed (21 U.S.C. 822(e)). DEA has provided a limited exception to this requirement (21 CFR 1301.12(b)(3)): practitioners who register at one location, but practice at others within the same State, are not required to register for any other location in that State at which they only prescribe controlled substances. If they maintain supplies of controlled substances, administer, or directly dispense controlled substances at a location, they must register for that location (21 U.S.C. 823(f)).

> The exception applies only to secondary locations within the same State in which the practitioner maintains his/her DEA registration. However, because the language in § 1301.12(b)(3) does not specify that it pertains to intrastate locations only, individual practitioners have been applying the regulation to interstate situations, which is contrary to the intent of the regulation, the CSA, and the underlying principles that apply to individual practitioner registration. DEA individual practitioner registrations are based on a State license to practice medicine and prescribe controlled substances. DEA relies on State licensing boards to determine that practitioners are qualified to dispense, prescribe or administer controlled substances and to determine what level of authority practitioners have, that is, what schedules they may dispense, prescribe, or administer. State authority to conduct the above-referenced activities only confers rights and privileges within the issuing State; consequently, the DEA registration based on a State license cannot authorize controlled substance dispensing outside the State. [See 71 Fed Reg 69478-01; see also 71 Fed Reg 69479.]

---

[4] See 71 Fed Reg 69480 (December 1, 2006).

The exception, as amended in December 2016,[5] provided that a separate registration is not required for

> An office used by a practitioner (*who is registered at another location in the same State in which he or she practices*) where controlled substances are prescribed but neither administered nor otherwise dispensed as a regular part of the professional practice of the practitioner at such office, and where no supplies of controlled substances are maintained.  [21 CFR 1301.12(b)(3) (emphasis added).]

We find no practical difference between the two versions because each provides an exception for only "another location in the same State."  Because respondent had his DEA registration only in New York at the time he prescribed controlled substances in Michigan for which he was required to have DEA registration, respondent failed to be properly registered in Michigan where he dispensed the medication.  Accordingly, respondent's conduct was not excepted under 21 CFR 1301.12(b)(3).

The record in this case establishes that competent, material, and substantial evidence supported the Boards' respective decisions.  They appropriately considered the evidence presented and determined the weight to be afforded to the MAPS reports, witnesses' testimonies, and other evidence submitted by the parties.  The Boards did not err by considering the MAPS reports for their decisions that respondent prescribed controlled substances in Michigan without a DEA registered address in Michigan as required by law.  Accordingly, the Boards did not abuse their discretion in this regard.

## C.  UNLAWFUL METHADONE PRESCRIPTION

Respondent also argues that competent, material, and substantial evidence did not support the Boards' findings that he unlawfully prescribed methadone to patient MS.  Respondent's argument focuses on "maintenance treatment" and whether the methadone prescription served the purpose of treating MS's addiction.  Even were we to accept respondent's argument that he was not engaged in maintenance treatment of MS's addiction, he would not be entitled to relief because a drug-addicted patient may not be prescribed methadone for take-home use during detoxification.

Pursuant to federal law, opioid agonist treatment medications[6] may be "administered or dispensed only by a practitioner licensed under the appropriate State law and registered under the appropriate State and Federal laws to administer or dispense opioid drugs . . . ."  42 CFR 8.12(h)(1).  Further, to "dispense" means "to deliver a controlled substance to an ultimate user . . . including the prescribing and administering of a controlled substance . . . ."  21 USC 802(10).  Practitioners who dispense narcotic drugs "for maintenance treatment *or* detoxification

---

[5] See 81 Fed Reg 97019 (December 30, 2016).

[6] Opioid agonist treatment medications include methadone.  42 CFR 8.12(h)(2)(*i*).

treatment" are required to have a separate DEA registration. 21 USC 823(g)(1) (emphasis added). The word "or" is a disjunctive term that indicates a choice between alternatives. *Michigan v McQueen*, 293 Mich App 644, 671; 811 NW2d 513 (2011).

Federal law provides that "[n]o medications shall be dispensed to patients in short-term detoxification treatment or interim maintenance treatment for unsupervised or take-home use." 42 CFR 8.12(i)(4). At times relevant to the agencies' proceedings, the Michigan Administrative Code also provided that patients prescribed take-home methadone during methadone maintenance treatment may only be dispensed methadone "in an oral, liquid form so as to minimize its potential for abuse." Mich Admin Code, R 324.14416(1).[7]

Maintenance treatment is defined as "the dispensing, for a period in excess of twenty-one days, of a narcotic drug in the treatment of an individual for dependence upon heroin or other morphine-like drugs." 21 USC 802(29). Detoxification treatment is defined as "the dispensing, for a period not in excess of one hundred and eighty days, of a narcotic drug in decreasing doses to an individual in order to alleviate adverse physiological or psychological effects incident to withdrawal from the continuous or sustained use of a narcotic drug and as a method of bringing the individual to a narcotic drug-free state within such period." 21 USC 802(30).

In this case, respondent assessed MS as opiate dependent with insomnia, anxiety, and chronic pain. Respondent testified that the process of "tapering" MS off of methadone and onto Suboxone would take between five and eight weeks. The record reflects that respondent prescribed MS pill-form methadone in large quantities on repeated dates, including an initial quantity of 154 tabs of 10-milligrams of methadone. Therefore, the record supports the Boards' determinations that respondent violated the prohibition against prescribing take-home methadone in non-liquid form to a patient in methadone maintenance treatment.

Even if we accepted respondent's position that insufficient evidence existed that the prescription served the purpose of maintenance treatment, rather than for tapering MS's methadone use, respondent's prescribing of methadone for MS constituted an unlawful use of methadone. "For detoxification from narcotic drugs, methadone shall be administered daily by the program under close observation in reducing dosages over a period of not more than 21 days." Mich Admin Code, R 325.14410(1). Additionally, "[t]ake-home medication shall not be allowed during detoxification." Mich Admin Code, R 325.14410(1)(a). The record reflects that respondent repeatedly referred to MS's taper plan as detoxification. Consequently, if respondent tapered MS off methadone as he claimed, rather than maintaining MS's methadone treatment, such prescribing of a patient take-home methadone during detoxification was also prohibited. Both state and federal regulations prohibit a physician from prescribing take-home medication to a patient during detoxification.

We find that competent, material, and substantial evidence supported the Boards' findings that respondent unlawfully dispensed methadone to MS. Accordingly, the Boards did not err in their respective decisions in this regard.

---

[7] These provisions were rescinded effective December 17, 2018.

IV. ORDER OF THE BOARD OF PHARMACY

A. POWER TO IMPOSE DISCIPLINE

Respondent argues that the Board of Pharmacy erred because it lacked the power to impose discipline on him since it did not act within 60 days of receiving the ALJ's proposed order. We disagree.

Agencies "are only allowed the powers that the Legislature chooses to delegate to them through statute." *Herrick Dist Library v Library of Mich*, 293 Mich App 571, 582; 810 NW2d 110 (2011) (citation omitted). The Board of Pharmacy may impose discipline on a person licensed under the PHC, MCL 333.1101 *et seq*., in a manner consistent with MCL 333.16101 *et seq*. See MCL 333.17768(1) and (2). MCL 333.16232 provides, "A disciplinary subcommittee shall meet within 60 days after the receipt of the recommended findings of fact and conclusions of law from a hearings examiner to impose a penalty." Generally, the term "shall" indicates a mandatory provision. *Jordan v Jarvis*, 200 Mich App 445, 451; 505 NW2d 279 (1993). However, the presence of other statutory language may indicate that the Legislature intended the term "shall" to be permissive. *Consumer Indus Servs v Greenberg*, 231 Mich App 466, 468-469; 586 NW2d 560 (1998). Because none of the provisions of the PHC provide for dismissal of a disciplinary complaint or limitation of the power to impose discipline on licensees for violation of processing deadlines, the violation of MCL 333.16232, in the absence of prejudice suffered by a respondent, does not mandate the dismissal of a disciplinary complaint or vacation of the discipline imposed. *Id*. at 469.

In this case, the record reflects that the ALJ issued a proposal for decision on April 7, 2017, the Board of Pharmacy issued its findings of fact and conclusions of law on December 13, 2017, and it issued its final disciplinary order on January 2, 2018. Although more than 60 days elapsed between the Board of Pharmacy's receipt of the ALJ's proposed findings and conclusions and the Board's disciplinary decision, because the term "shall" in MCL 333.16232 is permissive rather than mandatory, the Board of Pharmacy did not exceed its statutory authority or act outside of its jurisdiction by issuing its disciplinary decision after 60 days from the date of its receipt of the ALJ's proposed decision. The record does not reflect that respondent suffered any prejudice from the Board of Pharmacy's delay. We find nothing unfair or unjust in the Board of Pharmacy's action that warrants dismissal of the disciplinary complaint or vacating of the Board's disciplinary decision.

B. SUBOXONE DISPENSING RECORDS

Respondent argues that the Board of Pharmacy erred when it found that respondent dispensed Suboxone to patients. We disagree.

We give deference to an agency's findings of fact when the record presents conflicting evidence and calls into question the credibility of witnesses. *In re Gordon*, 323 Mich App 548, 558; 919 NW2d 77 (2018). Although evidence may support "a conclusion contrary to that of the disciplinary subcommittee, a reviewing court may not set aside findings merely because alternative findings also could have been supported by substantial evidence on the record." *Id*. at 559 (quotation marks and citation omitted).

To "dispense" means "to deliver a controlled substance *to an ultimate user . . .* including the prescribing and administering of a controlled substance . . . ." 21 USC 802(10) (emphasis added). In this case, the ALJ found that respondent did not engage in dispensing Suboxone medication to patients because respondent generally received deliveries of Suboxone and forwarded them to a treatment facility as part of a patient assistance program. The Board of Pharmacy rejected the ALJ's findings because respondent admitted in testimony during a proceeding that he gave Suboxone to a patient. The Board also rejected the ALJ's findings because respondent's former counsel testified that he concluded that respondent dispensed Suboxone to a patient from his office in Baldwin, Michigan.

The record reflects that the Board of Pharmacy thoroughly examined the record and based its findings and conclusions on the record evidence. Therefore, the Board of Pharmacy's finding that respondent unlawfully dispensed Suboxone to a limited number of patients who were ultimate users was supported by competent, material, and substantial evidence on the whole record.

## C. MORPHINE DESTRUCTION RECORDS

Respondent argues that he was not a dispenser under MCL 333.7303a(3) and was not required to fill out DEA Form 41 to record the destruction of morphine sulfate pills that a patient returned to him. We disagree.[8]

The PHC defines "dispense" as "to deliver *or issue* a controlled substance to an ultimate user or research subject by or pursuant to the lawful order of a practitioner, *including the prescribing*, administering, or compounding *necessary to prepare the substance for* the delivery or *issuance*." MCL 333.7105(3) (emphasis added). The plain language of the statute makes clear that a person who issues a prescription is a dispenser for the purposes of this statute. MCL 333.7105(4) defines a dispenser as a practitioner who dispenses a controlled substance. To "issue" a drug means to provide a prescription for that drug: a "prescription" is a written and signed order "to fill, compound or dispense a drug," MCL 333.17708(3), and "[o]nly a prescriber . . . may issue a prescription." MCL 333.17744(2). A prescriber who issues a prescription "is responsible for all of the requirements of state and federal law, rules, and regulations regarding the issuance of prescriptions and dispensing of drugs . . . under prescriptions." *Id*. MCL 333.7303a(6)(c) of the PHC provides in part that a licensed prescriber who dispenses controlled substances shall maintain "[r]ecords of all other dispositions of

---

[8] Respondent argues that petitioner waived the right to oppose this claim of error by not raising it in its exceptions to the ALJ's proposed decision. We disagree. MCL 333.16237(1) and (3) specifies that the disciplinary subcommittee must "review the recommended findings of fact and conclusions of law of the hearing examiner," and may "revise the recommended findings of fact and conclusions of law . . . ." The record reflects that petitioner addressed this issue in its closing argument before the ALJ, and nothing in the language of the governing statute requires a party to raise an issue in exceptions to a proposed opinion before the Board of Pharmacy may revise an ALJ's decision.

controlled substances under the licensee's control for not less than 5 years after the date of disposition." MCL 333.7311 in relevant part provides:

>    (1) A license under section 7306 to manufacture, distribute, prescribe, or dispense a controlled substance may be denied, suspended, or revoked or a licensee may be fined, reprimanded, ordered to perform community service or make restitution, or placed on probation by the disciplinary subcommittee upon a finding that an applicant for licensure or a licensee is subject to any of the following:

> \* \* \*

>    (f) The applicant or licensee is not in compliance with applicable federal, state, and local laws.

> \* \* \*

>    (h) The applicant or licensee has violated or attempted to violate, directly or indirectly, assisted in or abetted the violation of, or conspired to violate this article or rules of the administrator promulgated under this article.

In this case, respondent prescribed morphine sulfate to patient FB. Accordingly, respondent dispensed morphine sulfate because he issued a drug to FB by prescribing it. FB returned the morphine sulfate to respondent's office,[9] and respondent destroyed it. Respondent, however, did not document the destruction or report the action to the DEA or fill out any DEA forms. A DEA investigator testified that federal law specifies requirements for destruction of controlled substances. If a federal registrant receives a controlled substance for destruction, the registrant must complete an inventory of the controlled substance on a DEA Form 41 and send the controlled substance to the DEA or request authorization to destroy the drugs. Waldmiller testified that respondent failed to produce DEA Form 41 and that he did not have a record of what happened to the morphine sulfate. The morphine sulfate came into respondent's control when FB returned it to respondent's office; however, respondent failed to keep a record of the disposition (in this case, destruction) of the morphine sulfate. Therefore, respondent violated MCL 333.7303a(6)(c) by not maintaining any record of his action. Accordingly, the Board of Pharmacy did not err by ruling that respondent's failure to maintain disposition records of controlled substances violated MCL 333.7311(1)(f) and (1)(h).

---

[9] Had FB never returned the morphine sulfate, MCL 333.7303a(6) would not have applied because it only applies to controlled substances "under the licensee's control."

## V. ORDER OF THE BOARD OF MEDICINE

## A. MEDICAL MARIJUANA CERTIFICATION REQUIREMENTS

Respondent argues that competent, material, and substantial evidence did not support the Board of Medicine's finding that he violated his professional duties by issuing medical marijuana certifications before physically evaluating patients. We disagree.

First, respondent argues that the retroactive application of a 2012 definition of physician-patient relationship violated his right to due process and prejudiced him. We reject this argument because the Board of Medicine did not utilize the 2012 definition. Rather, the record reflects that, when finding that respondent violated the PHC by certifying patients for medical marijuana without a physical examination, the Board of Medicine relied on the September 2010 statement of the American Society of Addiction Medicine (ASAM) and the January 2011 statement of the Federation of State Medical Boards that specified the obligations of physicians who certify patients for medical marijuana.

Second, respondent argues that the Board of Medicine erred by finding that respondent incompetently certified an undercover officer, who posed as EH, for medical marijuana because competent, material, and substantial evidence did not support its decision. We disagree because the evidence unequivocally established that respondent certified EH for medical marijuana without a physical examination. The record reflects that witnesses presented conflicting testimony regarding the standard of care. However, we defer to an agency's findings of fact, "particularly with regard to witness credibility and evidentiary questions." *In re Gordon*, 323 Mich App at 558.

In September 2010, ASAM issued a recommendation that physicians certifying patients for medical marijuana "[a]dhere to the established professional tenets of proper patient care," which included a "good faith examination of the patient[.]" Respondent testified that the standard of care did not require him to physically evaluate a patient. Dr. Rodgers and Dr. Springer, however, testified that the standard of care required physicians to evaluate patients before issuing medical marijuana certifications. Respondent very briefly argues on appeal that medical marijuana certification is not the practice of medicine. The record reflects that Dr. Rodgers testified that the standards of care apply to any interaction a physician has with a patient. We reject respondent's argument because signing a medical marijuana certification involves a physician's interaction with a patient.

The Board of Medicine did not err by accepting Dr. Rodgers's and Dr. Springer's testimonies regarding the standard of care. The record reflects that the undercover officer who posed as patient EH testified that he obtained a medical marijuana certification in May 2011 without having contact with respondent at any point. Respondent admitted that he never met with EH in person. Both Dr. Rodgers and Dr. Springer testified that issuing a medical marijuana certification before seeing the patient fell below the standard of care. The record establishes that competent, material, and substantial evidence supported the Board of Medicine's finding that respondent violated the applicable standard of care when he issued EH a medical marijuana certification without a physical evaluation.

## B. IMPROPER PRESCRIPTIONS

Respondent argues that the Board of Medicine's findings that he provided improper treatment to patients JA, CK, DL, TT, and SW were not supported by competent, material, and substantial evidence. We disagree.

The record reflects that the ALJ found, based upon the evidence presented, that respondent's treatment decisions regarding JA were not negligent from January 2010 to January 2011. The ALJ, however, found that respondent's lack of office records pertaining to prescriptions of lorazepam and oxazepam during May and June 2011, and the reasons for prescribing those drugs during that period, and the lack of office records respecting any visits by JA with respondent after January 2011, constituted a breach of respondent's professional duties. The ALJ found that respondent lacked records sufficient to justify prescribing the two drugs after January 2011. The Board of Medicine adopted the ALJ's findings of fact and conclusions of law in this regard and concluded that respondent's recordkeeping was incomplete regarding JA.

The record reflects that MAPS reports indicated when respondent prescribed JA lorazepam and oxazepam. Respondent's office records were reviewed to determine when respondent met with JA. Dr. Rodgers testified regarding the adequacy of respondent's recordkeeping. He opined that respondent prescribed JA lorazepam during May 2011 without a physical examination of the patient. Further, although evidence established that respondent prescribed lorazepam and oxazepam after January 2011, respondent's office records failed to indicate office visits or any records of the prescriptions. We conclude that the Board of Medicine's decision adopting the ALJ's findings and conclusions regarding JA were supported by competent, material, and substantial evidence.

Respondent's argument that the Board of Medicine improperly found that his treatment of CK fell below the standard of care lacks merit. Evidence established that respondent prescribed CK 80 mgs per day of citalopram on November 20, 2011, despite the Federal Drug Administration's (FDA) warning issued in August 2011 that citalopram "should no longer be prescribed at doses greater than 40 mgs per day." Dr. Rodgers opined that respondent violated professional standards by not testing CK's heart function after the FDA issued its warning, or alternatively, lowered CK's citalopram dosage to 40 mgs. Dr. Springer testified that the FDA's warning did not establish an absolute contraindication and respondent's prescribing of 80 mgs did not necessarily constitute a breach of the standard of care. The ALJ concluded that respondent should have known of the FDA warning but lacked awareness of it despite the fact that the warning was printed on the drug's label. The ALJ concluded that respondent's failure to read the label information on the drug he prescribed constituted a breach of professional duty.

Although Dr. Rodgers's and Dr. Springer's testimonies conflicted, the Board of Medicine could properly accept the ALJ's finding and conclusions because the determination of the weight of the evidence was an issue for the trier of fact. *Wolfe,* 440 Mich at 514-515. We conclude that competent, material, and substantial evidence supported the ALJ's findings and conclusion that respondent's care of CK fell below the standard of care. Therefore, the Board of Medicine did not err by accepting the ALJ's determination.

-15-

Respondent next argues that the Board of Medicine lacked evidence to find that he violated his duties by prescribing DL a course of Vicodin without a complete workup and without addressing addiction risks. We disagree. The record reflects that respondent prescribed DL extra-strength Vicodin beginning on July 1, 2011, and continued prescribing DL the drug with refills over the course of approximately 12 months. Dr. Rodgers testified that respondent's office records did not report physical examinations of DL. Dr. Springer testified that when prescribing a patient extra-strength Vicodin, the patient's use of the drug required monitoring through drug screens and inspections of MAPS reports to ensure that the patient did not shop for doctors to obtain the drug. Dr. Springer testified that no urine drug screens or MAPS reports were found in DL's medical records. Dr. Rodgers opined that respondent's treatment did not meet the standard of care because his evaluations did not support the diagnosis for the prescription in December 2011. The ALJ concluded, based upon the witnesses' testimonies and the evidence presented, that respondent's failure to do patient workups and failure to address the risk of addiction constituted a breach of professional duty. We conclude that competent, material, and substantial evidence supported the ALJ's findings and conclusions, and therefore, the Board of Medicine did not err by accepting those findings and conclusions.

Respondent argues that competent, material, and substantial evidence did not support the Board of Medicine's decision regarding TT because he saw TT within a month of prescribing TT Suboxone. Respondent also argues in relation to this claim of error that Dr. Rodgers lacked the requisite qualifications to opine regarding the applicable standards of care. We disagree.

As previously discussed, Dr. Rodgers had the requisite qualifications to opine regarding controlled-substance prescribing and the applicable standards of care associated with prescribing controlled substances. Therefore, we reject respondent's argument in this regard.

The record reflects that respondent first prescribed TT Suboxone on February 20, 2012. Respondent presented an undated, misfiled page of notes that indicated that he spoke via phone with TT who had just been released from a detoxification program. Respondent testified that he spoke with TT's social worker and learned that he had been prescribed Suboxone by another doctor. Respondent took TT as his patient and called in a Suboxone prescription on February 20, 2012, without a personal visit with TT. Respondent testified that the only time he saw TT occurred on March 20, 2012.

Dr. Rodgers testified that a physician should see the patient under the vast majority of circumstances. Dr. Rodgers opined that respondent's undated note inadequately reported what happened. Further, Dr. Rodgers opined that respondent's prescribing Suboxone to TT failed to meet the standard of care because respondent performed no physical exam and failed to document evaluations to monitor the safety or effectiveness of his treatment of TT.

We conclude that competent, material, and substantial evidence supported the ALJ's findings and conclusions and the Board of Medicine did not err by accepting them. Accordingly, we find no merit to this claim of error.

Respondent argues further that he did not breach standards of care related to the treatment of SW because he saw SW regularly and the label of his medication did not mention weight-loss monitoring. We disagree.

The record reflects that respondent treated SW for obesity. Respondent had one formal patient visit with SW and prescribed him Adipex, a stimulant used for weight loss. SW's medical records indicated that respondent did not conduct any further formal examinations of SW. Instead, respondent consulted via phone with SW after which respondent authorized a refill of Adipex. Dr. Rodgers testified that respondent's refilling of the prescription of this controlled substance did not meet the standard of care because prescribing required re-examination of the patient to ensure that the stimulant did not raise blood pressure or cause toxicity. Dr. Springer testified that the standard of care required a physician to weigh a patient before refilling Adipex and monitor and document the patient's weight over the long term. He testified that the failure to regularly document the patient's weight violated the standard of care. Respondent testified that he spoke with SW who worked at the hotel at which respondent stayed repeatedly and respondent contended that he could estimate someone's weight by looking at him.

The ALJ determined that respondent's lack of formal visits and examinations of SW and the failure to weigh SW to monitor his weight over time constituted a breach of respondent's professional duty. We conclude that competent, material, and substantial evidence supported the ALJ's findings and conclusions. Therefore, the Board of Medicine did not err by accepting the ALJ's findings and conclusions.

## C. IMPROPER RECORDKEEPING

Respondent argues that competent, material, and substantial evidence did not support the ALJ and Board of Medicine's findings regarding his failure to keep medical records for patients RA, KK, PM, TT, and SS. We disagree.

In general, Dr. Rodgers testified that the applicable standard of care included properly documenting patient care. Dr. Springer testified that failing to document medical care and failing to maintain the documentation in an accessible fashion constitutes a violation of a physician's general duties. Dr. Rodgers also testified that the standard of care required that a physician must maintain medical records to determine the safety and effectiveness of a controlled substance.

Respecting his treatment of RA, respondent argues that, although his records could be more clear, the records he presented sufficed to establish that he kept records and did not violate the applicable standard of care. The record reflects that respondent testified that he saw RA at a clinic in Flint on May 3 or 4, 2011. Except for a medical marijuana certificate, respondent could not find any records pertaining to his meeting with RA and he did not recall if he physically examined him. RA visited respondent again on May 9, 2011, during which respondent diagnosed RA as having various maladies including chronic pain. The record reflects that respondent prescribed lorazepam for anxiety and Vicodin for chronic pain. Respondent also saw RA on May 31, 2011. During that visit RA revealed that he had an opioid addiction problem and desired to overcome his addiction. Respondent's records indicated that he performed a physical examination, assessed RA's opioid dependency, and prescribed a regimen of drugs for side effects from withdrawal.

Dr. Rodgers testified that respondent's records of RA's May 9 visit indicated no patient history, evaluation, or physical examination performed by respondent. Dr. Springer testified that

respondent appropriately diagnosed RA's anxiety condition and opined that RA's description of pain supported respondent's assessment of chronic pain and a history of that condition. The record reflects that Dr. Springer equivocated in his testimony regarding respondent's prescribing of Vicodin to RA. He testified that he did not use addictive drugs to address anxiety or to treat pain. Dr. Rodgers opined that respondent's records inadequately reported the May 31, 2011 visit and respondent's treatment of RA because the notes were too vague regarding what opiates RA was taking and who prescribed the regimen of drugs for withdrawal symptoms. Dr. Springer opined that respondent appropriately treated RA.

The ALJ found that respondent lacked records of his first office visit with RA which made it unclear what respondent did to reach his conclusion that RA had severe and chronic pain. The ALJ found that respondent breached his professional duty to keep proper records. Respecting the other two office visits, the ALJ did not find breaches of respondent's professional duties. Competent, material, and substantial evidence supported the ALJ's finding that respondent did not maintain proper records for RA. The Board of Medicine, therefore, properly accepted the ALJ's findings and conclusions respecting respondent's treatment of RA and inadequate medical recordkeeping.

Respondent argues that he did not fail to maintain KK's medical records. We disagree. The record reflects that respondent signed a medical marijuana certificate for KK and prescribed him dronabinol, a pharmaceutical-grade cannabis-based controlled substance. Waldmiller asked for respondent's medical file for KK and respondent failed to locate it and never provided it to her. MAPS reports showed that respondent issued three dronabinol prescriptions for KK. Respondent testified that he lacked certainty where he saw KK. He testified that he recalled that he made a record of his encounter with KK but his disorganized filing prevented him from finding the medical records. Respondent believed that KK's medical record consisted of a single page that was lost during his transition to electronic medical records. Dr. Springer testified that failure to keep complete medical records fell below the minimal standards for a physician who prescribed a patient drugs. The ALJ found that respondent treated KK and prescribed him dronabinol but failed to maintain treatment records which constituted a breach of respondent's professional duty.

We conclude that competent, material, and substantial evidence supported the ALJ's finding that respondent did not maintain proper records for KK. The Board of Medicine, therefore, properly accepted the ALJ's findings and conclusions respecting respondent's inadequate medical recordkeeping for this patient.

Respondent next argues that an unreliable MAPS report was the only evidence that he provided PM with codeine-containing cough syrup. As previously discussed, as the trier of fact, the Board of Medicine could appropriately assign evidentiary weight to MAPS reports. The record reflects that respondent's records indicated two visits with PM. Respondent's record of the first visit did not reflect prescribing PM codeine-containing cough syrup. MAPS reports, however, indicated that respondent prescribed PM codeine-containing cough syrup in relation to that first visit and issued a second prescription following PM's second office visit. Dr. Rodgers opined that respondent's records included no patient history or examination. The ALJ found respondent's notes inaccurate and negligent because respondent reported in his notes that he recommended an over-the-counter cough medication.

We conclude that competent, material, and substantial evidence supported the ALJ's finding that respondent did not maintain proper records for PM. The Board of Medicine, therefore, properly accepted the ALJ's findings and conclusions respecting respondent's inadequate medical recordkeeping for PM.

Respondent also argues that he bore no fault for his four-year delay in providing TT's medical record because he had difficulty locating patient files without demographic information. The ALJ found respondent's recordkeeping system inadequate and his four-year delay in producing a full usable record for TT a breach of respondent's professional duty. We conclude that competent, material, and substantial evidence supported the ALJ's finding that respondent did not maintain proper records for TT. The Board of Medicine, therefore, properly accepted the ALJ's findings and conclusions respecting respondent's inadequate medical recordkeeping for this patient.

Respondent argues further that he did not breach his professional duties regarding providing records to Waldmiller because Waldmiller was not a "patient." We disagree. On June 12, 2013, Waldmiller requested medical records for patients, including for SS. Waldmiller testified that respondent failed to provide her with medical records for SS. The record reflects that respondent produced his file for SS at a hearing held on May 26, 2016. Respondent testified that he did not provide his records for SS's treatment because he did not know in what office location he treated SS. The ALJ found that respondent's failure to find his medical file because it was hard to find constituted negligence because, under MCL 333.16213(1), a physician must maintain patient records and ensure their accessibility and availability to patients, and the government had statutory authority to investigate the complaint against respondent under MCL 333.16221 and MCL 333.16233(1). We conclude that competent, material, and substantial evidence supported the ALJ's finding that respondent did not maintain proper records for SS. The Board of Medicine, therefore, properly accepted the ALJ's findings and conclusions respecting respondent's inadequate medical recordkeeping respecting this patient.

Respondent also vaguely asserts that his due process rights were violated but fails to cite legal authority or provide a cogent argument supporting his claim. This Court has explained that, "where a party fails to brief the merits of an allegation of error, the issue is deemed abandoned by this Court." *Yee v Shiawassee Co Bd of Commrs*, 251 Mich App 379, 406; 651 NW2d 756 (2002) (citation omitted).

> It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow. [*Id*. (citation omitted).]

Because respondent failed to cite authority and explain the rationale for this claimed error, we decline to address it.

-19-

## VI. CONCLUSION

For all of these reasons we affirm both the Board of Medicine's and the Board of Pharmacy's orders.

/s/ Patrick M. Meter
/s/ Deborah A. Servitto
/s/ James Robert Redford